FILED
08/21/2018
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 10, 2017 Session

## STATE OF TENNESSEE v. ROBERT A. FRANKLIN

**Appeal from the Criminal Court for Hamilton County**
**No. 286862   Don W. Poole, Judge**

_____

### No. E2017-00334-CCA-R3-CD
_____

The Hamilton County Grand Jury indicted Robert A. Franklin, the Defendant-Appellant, for driving under the influence of an intoxicant (DUI by impairment), driving while the alcohol concentration in his blood or breath was 0.08% or more (DUI per se), violating the financial responsibility law, and violating the vehicle registration law.  Prior to trial, Franklin filed a motion to suppress evidence from his search, seizure, and arrest on the basis that the sobriety checkpoint where this evidence was obtained was unconstitutional. After the trial court denied this motion to suppress, Franklin filed a motion to reconsider, which was also denied.  Franklin next filed a motion to dismiss the indictment, or in the alternative, to exclude the evidence from his blood test, arguing that Code section 55-10-413 is unconstitutional because it creates a fee system that violates the right to due process and a fair trial.  Although Franklin's request to dismiss the indictment or exclude the evidence was denied, the trial court granted his request for a jury instruction regarding the fee in Code Section 55-10-413(f).  Thereafter, during voir dire, Franklin asserted that the State engaged in purposeful discrimination in violation of Batson v. Kentucky, 476 U.S. 79 (1986), when it used its peremptory challenges to exclude two African-American individuals from the jury pool.  At the ensuing trial, the jury convicted Franklin of DUI per se and violating the vehicle registration law but acquitted him of DUI by impairment, and the State dismissed the charge for violating the financial responsibility law.  On appeal, Franklin argues that the trial court erred in:  (1) denying his motion to suppress because the checkpoint was unconstitutional; (2) overruling his Batson challenge; and (3) denying his motion to dismiss the indictment, or in the alternative, to exclude the evidence based on the unconstitutionality of Tennessee Code Annotated section 55-10-413(f) (2017).  Because the trial court erred in denying the motion to suppress given the unconstitutionality of the checkpoint, we reverse the judgments of the trial court, vacate Franklin's convictions, and dismiss the charges.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed;**
**Convictions Vacated; Charges Dismissed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JJ., joined.

Jerry H. Summers, Chattanooga, Tennessee, for the appellant, Robert A. Franklin.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Neal Pinkston, District Attorney General; and Kate Lavery, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**Motion to Suppress.** Franklin filed a motion to suppress, as well as two supplements to this motion, generally arguing that evidence from his search, seizure, and arrest should be suppressed because the sobriety checkpoint where this evidence was obtained violated the Fourth Amendment of the United States Constitution and article I, section 7 of the Tennessee Constitution.

At the April 15, 2013 hearing on Franklin's motion to suppress, District Captain David McGill of the Tennessee Highway Patrol (THP) testified that he requested a sobriety checkpoint, or roadblock, take place on June 15, 2012, from 11:00 p.m. to 12:30 a.m. at an old motel on Cherokee Boulevard in Chattanooga (hereinafter "checkpoint"). Captain McGill stated that he completed a THP Checkpoint Request/Authorization form (hereinafter "Request/Authorization form") regarding his request and that this checkpoint was approved by Lieutenant Colonel Wayne Springer, his superior officer. This Request/Authorization form, which was admitted as an exhibit, stated that "[a]ll personnel participating in Checkpoints will be responsible for following procedures outlined in General Orders" and ordered that "[a]ll" vehicles at the checkpoint would be "momentarily stopped and the operator asked to exhibit the necessary information."

Captain McGill acknowledged that although the normal procedure was to provide advance notice of the checkpoint to the media, the media was never notified of this checkpoint. The THP Checkpoint Site Selection/Removal Checklist form (hereinafter "Site Selection/Removal Checklist") for the Cherokee Boulevard site, which was entered as an exhibit, had boxes that could be checked if certain factors had been considered for a particular checkpoint location. For the checkpoint in issue, all of the boxes on the form were checked, indicating that the following factors had been considered for that site: the frequency of traffic violations or traffic crashes; historical statistical evidence and the knowledge of alcohol related or other types of crashes where impairment was indicated as a contributing factor; the location provided for the safety of motorists and officers and provided adequate visibility for oncoming traffic; the location avoided undue inconveniences to the public; the location gave motorists adequate prior warning that a

- 2 -

checkpoint was ahead; the location provided sufficient space to display adequate advance warning signs and sufficient lighting to ensure motorists' and officers' safety; the location provided ample room for police and subject vehicles; the location provided a safe area to move a vehicle from traffic in the event further inquiry of the driver was necessary; the location was away from businesses, residential driveways, alleys, and intersecting streets or highways that could be impacted by the operation; the location was free from obvious hazards on the highway; and the deterrent effect created by the operation of the checkpoint.

Captain McGill noted that he and Lieutenant Phillips signed this Site Selection/Removal Checklist." The form itself shows that Lieutenant Phillips and Captain McGill signed the form on December 31, 2010, approximately two-and-a-half years prior to the time the checkpoint took place. Lieutenant Phillips signed under the portion of the form stating "Inspected By." The form also had boxes where the District Captain could check "Approved" or "Denied," and Captain McGill checked the box for "Approved."

Captain McGill affirmed that he was not present at the checkpoint. He acknowledged that he could not confirm whether all the factors marked on the Site Selection/Removal Checklist had actually been considered prior to choosing the June 15, 2012 checkpoint location, only that these were the factors the Tennessee Highway Patrol had said it considered when choosing this site.

THP Lieutenant Christie Phillips testified that she and Captain McGill requested the checkpoint and that the checkpoint had been approved by Lieutenant Colonel Springer, their superior officer. Lieutenant Phillips said the checkpoint site had come from a list of approved sites that had been prepared "years ago," prior to the time that she became a lieutenant. She said that this particular site was chosen because there had been crashes on Highway 27, but because THP could not conduct a checkpoint on Highway 27, they had chosen Cherokee Boulevard as the location for the checkpoint because it ran parallel to Highway 27. Lieutenant Phillips confirmed that an event known as the Riverbend Festival had taken place on the same night as the checkpoint.

Lieutenant Phillips confirmed that neither she nor Captain McGill worked at the checkpoint and that the site supervisor had the discretion to cancel the checkpoint for bad weather or insufficient personnel. She also said that if traffic became congested, the site supervisor also had the discretion to wave traffic through in order to keep vehicles moving for safety reasons. Lieutenant Phillips identified Exhibit 3, General Order 410-1 ("the Order"), which supplied the guidelines the THP used for sobriety checkpoints. She stated that Section (E) of this Order required that the supervisor not participate in stopping vehicles, that there be at least four uniformed personnel at the checkpoint, and

that the supervisor determine the number of other personnel involved in the checkpoint. She also said that Section (F) of this Order provided the standard operating procedure requiring the use of traffic cones, marked patrol vehicles, good lighting, and vests and flashlights by officers. In addition, Lieutenant Phillips noted section (G) stated that sobriety checkpoints were to be conducted for a minimum of one hour and a maximum of two hours. She confirmed that the site supervisor had the discretion to terminate a checkpoint if the site was causing a hazardous condition.

Lieutenant Phillips stated that she and Captain McGill signed the THP Checkpoint Activity Report ("Activity Report"), which was completed after the conclusion of the checkpoint. This Activity Report showed the date, time, and location of the sobriety checkpoint, the personnel participating in the checkpoint, the fact that patrol units had their emergency lights activated, that the site had been approved, that the media had been notified, that traffic cones had been used, and that the checkpoint location had been illuminated. The report specifically stated that THP Sergeant David Matthews, Trooper Billy Collins, and Trooper Ronnie Swafford as well as six police officers, presumably from the Red Bank Police Department (RPD), were present at the June 15, 2012 sobriety checkpoint. Lieutenant Phillips confirmed that although the "media notified" box on the Activity Report had been checked, the media had not been notified of the checkpoint. She added that this was the first time she was aware of the media not being notified of an impending checkpoint. The State stipulated that a media release had not been completed for this checkpoint.

A copy of the Activity Report, which was entered as an exhibit, specified that a review of department guidelines had been conducted, that the site had been approved prior to the checkpoint, that the site had been approved by Lieutenant Phillips, and that the media had been notified by way of "radio" and "printable" materials. The Activity Report also stated that it had been "submitted by" and "keyed by" Sergeant Steve Bearden, an officer who was not present at the checkpoint.

Lieutenant Phillips confirmed that 285 vehicles passed through the checkpoint on June 15, 2012. He stated that one person was written a citation for "DUI," eight individuals were written citations for "DWI," and several individuals were written citations for "open container" and other minor violations during the checkpoint. Lieutenant Phillips also said that one person was arrested for a felony and one person was arrested for a misdemeanor at the checkpoint.

Lieutenant Phillips acknowledged that there were only three THP officers at the checkpoint even though Section III(E)(2)(a) of the Order required a minimum of four uniformed officers. She said that because she was not present at the checkpoint, she relied upon what the officers, who were present at the checkpoint, told her regarding the

location of the traffic cones and vehicles. After acknowledging that the THP kept statistics regarding vehicle wrecks in specific areas, Lieutenant Phillips identified a document from the THP that contained statistics for traffic crashes on Cherokee Boulevard in the area between Frazier Avenue, North Market Street, and West Bell Avenue, the general area in which the checkpoint in this case was located. This document, which was admitted as an exhibit, stated that during the period from 2003 to 2012, there were no alcohol-related crashes involving fatalities and only four alcohol-related crashes with injuries at the location of the June 15, 2012 checkpoint. The record shows that Lieutenant Phillips did not actively consider these statistics when the decision to have a checkpoint at that location was made and that the site for the checkpoint came from a preauthorized list of locations for checkpoints.

THP Sergeant David Matthews testified that he was the site supervisor for the checkpoint conducted on June 15, 2012, on Cherokee Boulevard. He confirmed that he had nothing to do with the selection of the checkpoint location, the authorization of the checkpoint, or the time of the checkpoint. Sergeant Matthews said he conducted a pre-checkpoint briefing, where he told the officers that they should stop every vehicle momentarily and that if they did not observe any signs of impairment or another violation, they should allow the vehicle to pass through the checkpoint. Sergeant Matthews added that he "[n]ormally" completes the Activity Report. When asked how the media notification box was checked on the Activity Report when no media notification actually occurred for this checkpoint, Sergeant Matthews said that as site supervisor, he had "no way of really knowing" whether the media had been notified. He said he was "under the assumption" that the media had been notified because the checkpoint had been approved by the chain of command and that "the chain of command in the higher ups [we]re the one that's [sic] supposed to see to that."

Sergeant Matthews said signs were placed to warn drivers of the checkpoint, and street lights and a four-lane road provided sufficient light and space to ensure the safety of motorists and officers. He also said there were parking lots located close to the site, where vehicles could be moved if further investigation was needed. Sergeant Matthews asserted that although THP policy required that the checkpoint last a minimum of one hour and a maximum of two hours, he had the authority as site supervisor to terminate the checkpoint for bad weather, or an emergency, or if arrests reduced the number of officers present at the checkpoint. He said that while a supervisor and three officers were required to be present, these officers did not have to be state troopers. Sergeant Matthews confirmed that he, Trooper Collins, and Trooper Swafford were the only state troopers at the checkpoint.

Sergeant Matthews said that when Trooper Collins and Trooper Swafford left the checkpoint to transport Franklin following his arrest, he was the only THP officer at the

site, so he decided to terminate the checkpoint. Although Sergeant Matthews acknowledged that he could have continued the checkpoint with just the officers who were present from the Red Bank Police Department, he claimed this would have kept these Red Bank officers from responding to their priority calls.

Sergeant Matthews also stated that he terminated the checkpoint for safety reasons because of heavy traffic. He explained, "After about an hour[,] Riverbend [Festival] had started letting out pretty heavily[,]" and they were "getting an extreme amount of traffic coming through the tunnel" and could not allow the vehicles to back up into the tunnel for safety reasons. Sergeant Matthews said that at that point, the officers were motioning so much traffic through that they were unable to check anyone, so he terminated the checkpoint.

Sergeant Matthews was unable to recall where he was when Franklin came through the checkpoint and could not remember whether traffic became congested before or after Franklin passed through the checkpoint. He acknowledged that he did not personally notify the district attorney of this checkpoint, as was required by the Section D of the Order. In addition, although Section D required that all local law enforcement agencies within the jurisdiction be notified of the checkpoint, Sergeant Matthews was unsure whether the Chattanooga Police Department or the Hamilton County Sheriff's Office had been notified in accordance with the Order. Moreover, although the Order required the district captain to prepare a press release to the local media stating that the Tennessee Highway Patrol would be conducting checkpoints, he did not personally ensure that this was done. Sergeant Matthews admitted that he did not ensure that all the requirements listed on the Site Selection/Removal Checklist were completed and assumed that Lieutenant Phillips and Captain McGill, who signed that form, had made sure that those requirements had been completed.

Sergeant Matthews acknowledged that all checkpoints had to be recorded. He stated that although he had not viewed these recordings, a video recording had been made of the vehicles passing through the checkpoint and a second video recording had been made of Franklin's field sobriety tests. He stated, "[I]f you're talking to the subject and anything you're doing with the subject[,] then you're supposed to have [the microphone] on. But if they're discussing things between themselves about it[,] then they can [turn the microphone off]." While Sergeant Matthews said he would not recommend that THP officers turn off their microphones while discussing a subject's performance on field sobriety tests, he was unsure whether doing so was actually a violation of THP policy.

THP Trooper William Collins testified that he stopped Franklin at the checkpoint. At the time of the stop, he noted that Franklin had "an odor of intoxicant" emanating from his person and saw that Franklin's license tags had expired. Thereafter, Trooper

Collins and his trainee, Trooper Swafford, had Franklin perform field sobriety tests, and based on Franklin's performance on these tests, Trooper Collins believed Franklin was impaired. When Trooper Collins was asked whether he thought it was necessary that his dialogue with trainee Trooper Swafford be included in the video recording from the checkpoint, he replied, "Yes. I mean, you know, I don't want it to look like we're hiding anything." Trooper Collins said that if the video recording did not include his conversation with Trooper Swafford, this was "[b]y accident." He stated that Franklin's blood alcohol content was later found to be 0.12%.

Trooper Collins asserted that there was a tunnel near the checkpoint, and there were signs instructing drivers about the checkpoint on the north end of the tunnel. Once a vehicle entered the tunnel, there was no way to turn around to avoid the checkpoint, and the only way to avoid the checkpoint was to exit the tunnel and then turn down Ashmore Avenue. Trooper Collins said that as traffic began backing up in the tunnel, the site supervisor told them to wave vehicles through the checkpoint. He did not recall whether Franklin was stopped at a time when all the vehicles were being stopped or when traffic was being waved through the checkpoint. He confirmed that when traffic began backing up into the tunnel where it could cause an accident, then the site supervisor instructed them to wave traffic through the checkpoint. The recordings of Franklin's field sobriety tests and arrest as well as the two recordings of the checkpoint were introduced as exhibits during Trooper Collins' testimony.

THP Trooper Ronnie Swafford testified that he noticed that Franklin had an expired tag as he was passing through the sobriety checkpoint. He approached Franklin's window, told him his tag had expired, and asked him if he had been drinking that night. When Franklin responded that he had consumed a couple of drinks, Trooper Swafford noticed that Franklin had "a little slurred speech" and "was fumbling around in the vehicle looking for his insurance and for his registration." Franklin was also looking for his driver's license in his billfold, even though his license was hanging from a lanyard around his neck. In addition to these observations, Trooper Swafford said he smelled alcohol coming from Franklin's person. At that point, he asked Franklin to pull over to the side of the road, where he had him perform field sobriety tests. When Franklin performed poorly on these tests and had indicators showing his blood alcohol concentration (BAC) was above the legal limit, he was arrested. Because Trooper Swafford and Trooper Collins left the scene after they arrested Franklin, Sergeant Matthews was the only trooper who remained at the checkpoint. Franklin's impairment was later verified when TBI testing of Franklin's blood sample showed that his BAC was 0.12%.

Trooper Swafford acknowledged that the checkpoint was on one side of the tunnel and that all of the signs warning drivers were on the same side of the tunnel as the

checkpoint and the officers. He said that he and the other officers waved cars through the checkpoint when traffic became congested in the tunnel and that he did not recall any backup of vehicles when Franklin came through the checkpoint. Trooper Swafford acknowledged that he and Trooper Collins turned their microphones off when they conferred after Franklin completed his field sobriety tests.

Following Trooper Swafford's testimony, a letter from THP Administrative Sergeant James D. Van Dyke was entered into evidence. This letter, which was in response to defense counsel's request for information about the June 15, 2012 checkpoint, stated that "[r]ecords pertaining to media notification [of the June 15, 2012 sobriety checkpoint in Hamilton County], required by Department of Safety General Order 410-1, could not be located," which led Sergeant Van Dyke to conclude that "the required media notification of this sobriety checkpoint was not accomplished." This letter explained that the only records related to this checkpoint were "the request and approval to hold this checkpoint and the checkpoint activity sheet."

Jeffrey Street testified that on June 15, 2012, he left his work and drove downtown to pick up his friend Melissa Powell, who had attended the Riverbend Festival. Street drove Powell to her car on the North Shore. Thereafter, Street and Powell, who were in separate cars, drove down Cherokee Boulevard to Dayton Boulevard, where they drove through the tunnel prior to encountering the checkpoint. Street said that there were not a large number of vehicles stopped as he went through the tunnel and that he did not recall a lot of traffic as he approached the checkpoint. He added that he was allowed to go through the checkpoint without being stopped.

Melissa Powell testified that when she drove through the tunnel on Cherokee Boulevard, she saw blue lights flashing. She stated that she never saw any indication that there was a checkpoint before she exited the tunnel. Powell said she stopped prior to reaching the checkpoint but was allowed to pass through the checkpoint without being questioned by any officers and without having to roll down her window. She said she drove through the checkpoint at 11:45 p.m., and there did not appear to be a lot of traffic backed up in the tunnel at that time, although she acknowledged that there was traffic on the road.

On May 10, 2013, the trial court entered an order denying the motion to suppress, which stated in pertinent part:

> The Court understands the [S]tate to contend that, because [State v. Downey, 945 S.W.2d 102 (Tenn. 1997),] recognizes a compelling state interest in deterring motorists from driving under the influence of an intoxicant and sobriety checkpoints on public roads advance that interest, it

need never prove that any particular checkpoint advances that interest. The Court agrees that Downey recognizes, for all cases, a compelling state interest in deterring motorists from driving under the influence of an intoxicant. It respectfully disagrees, however, that, by also recognizing the value of sobriety checkpoints, Downey entirely establishes the value of any particular checkpoint. The [Elliott] Aloyo court does not treat Downey as doing so. It remarks on the number of arrests at the checkpoint and the possible deterrent effect of the checkpoint because of prior publicity before finding that "this checkpoint has met the second prong of the Downey test," [No. M2008-02359-CCA-R3-CD, 2010 WL 596435, at *4 (Tenn. Crim. App. Feb. 19, 2010)].

In this case, unlike Aloyo, there was no advance publicity and therefore no possible advance deterrent value. In addition, the arrest rate in this case, one arrest in one hour, was twenty-five percent less than in Aloyo, three arrests in two-and-one-quarter hours, or one arrest in three-quarters of an hour. Furthermore, in this case, unlike Aloyo, apparently, there was no knowledge or review of recent statistics from the site and the only reason for the selection of the site was a years-old approval.

It seems to the Court, however, that what gives the checkpoint in this case deterrent value, future deterrent value, is its proximity, temporal and spatial, to a summer festival at which, presumably, some festival goers consume intoxicants. Nor does the Court regard the termination of the checkpoint after one arrest as nullifying this value. Although the initial number of uniformed officers in this case and the number of officers in Aloyo, nine, was the same, one of the officers in this case was in training. In addition, the traffic in this case, more than two hundred eighty-five vehicles (two hundred eighty-five vehicles checked; an unknown number greater than two not checked) in one hour was more than twenty percent heavier than in Aloyo, five hundred twelve vehicles (five hundred eleven vehicles checked and one vehicle not checked) in two and one-quarter hours.

The Court understands the defendant to contend there were several flaws in the execution of the checkpoint and, as a consequence, even if the checkpoint satisfies the public-interest and efficacy parts of the Downey test, it does not meet the interference-with-individual-liberties part of the Downey test. The Court respectfully disagrees.

First, the officers in the field did not make the decision to conduct the checkpoint. A superior did so. Second, in conducting the checkpoint, the officers in the field were implementing "neutral standards previously fixed by an administrative decision or regulation[,"] the general order, Exhibit 3.

Third, the lack of one or more avoidance routes before the checkpoint does not violate the general order. The general order contains no requirement that one or more avoidance routes be available to motorists who wish to avoid the checkpoint. Section V(H) of the order provides as follows:

> The placement of personnel at locations to observe for and procedures to follow when detection occurs of a motorist turning around to avoid the checkpoint will also be addressed [in the pre-checkpoint briefing].

> 1. A motorist who chooses to avoid a checkpoint should be allowed to proceed unless traffic violations are observed or probable cause exists to take other action.

Fourth, that officers did not stop all vehicles does not necessarily violate the general order. The checkpoint authorization, Exhibit 1, requires officers to stop "all" vehicles and ask their operators to exhibit the necessary information. The checkpoint-activity report, Exhibit 4, also states that the predetermined sequence or pattern for stopping vehicles was "every vehicle[."] Subsection III(G)(5)(c) of the general order, however, provides in part:

> If traffic backs up creating a hazardous condition, all vehicles will be allowed to pass until the back-up is cleared.

In this case, Mr. Street testified that officers did not stop him, though traffic in the tunnel was unremarkable, and Ms. Powell, who was following Mr. Street, testified that she stopped at the checkpoint but did not open her window. Mr. Street and Ms. Powell, however, may not have noticed congestion in the tunnel because they arrived at the back of a group of vehicles cleared through the checkpoint and were included in the group. The site supervisor was in a better position than any motorist to assess the necessity to clear traffic.

- 10 -

Nor does the average volume of traffic belie the site supervisor's testimony in this respect. In Aloyo, nine officers were able to stop an average of about five cars a minute without having to clear congestion. Traffic, however, ebbs and flows. It is not reasonable to presume a constant volume. In addition, the rate of detentions in this case, ten in one hour, was more than twice than in Aloyo, nine in two-and-one-quarter hours. Absent a video recording of the checkpoint approaches that belies the site supervisor's account of the necessity to clear traffic through the checkpoint, the Court accredits his testimony that there was such a necessity.

Fifth, in finding the site supervisor in a better position than motorists to assess congestion at the checkpoint, the Court recognizes the difficulty for defendants in challenging the execution of a sobriety checkpoint without a video recording. The general order, however, does not require a video recording. Nor does any Tennessee case of which the Court is aware.

Sixth, the early termination of the checkpoint after one hour for lack of personnel does not necessarily violate the general order. In criticizing the decision to terminate the checkpoint on the ground that his arrest occupied only two troopers, leaving the site supervisor and six [Red Bank Police Department] officers to man the checkpoint, the defendant does not consider that the number of personnel above the minimum necessary to man a checkpoint depends in part on the volume of traffic and the coincidence, number, and duration of other detentions.

Seventh, although the record does not contain proof that the checkpoint was bi-directional, as section III(G)(5)(a) of the general order requires, the Court does not attribute the omission to a violation of the general order in this respect. The defendant did not allege any violation of the general order in this respect.

The Court does find one flaw in the execution of the checkpoint: the lack of advance publicity. The site supervisor assumed and reported media notification, but, as a letter to counsel, Exhibit 8 reflects, officials were unable to locate any record of media notification. As the [S]tate contends, however, the constitutionality of a checkpoint does not depend on flawless execution and no one circumstance is necessarily outcome determinative. Considering that the lack of media notification did not deprive the checkpoint of all deterrent value, only advance deterrent value, the Court does not regard this omission as outcome-determinative.

- 11 -

**Motion to Reconsider.** On June 30, 2013, Franklin filed a motion to reconsider the denial of the motion to suppress, arguing that testimony from the April 15, 2013 hearing established that the sobriety checkpoint failed to comply with the Order because (1) there was no warning of the checkpoint until after the cars had entered the area of the checkpoint, (2) there was no media announcement given prior to the checkpoint and (3) the State and its agents failed to preserve audio recordings related to his field sobriety tests that were critical to establishing that the checkpoint was conducted in conformity with the Order and constitutional mandates.

At the September 30, 2013 Hearing on Franklin's motion to reconsider, RPD Officer Mark Taylor testified that he assisted with the checkpoint. He stated that drivers exiting the tunnel could turn onto Ashmore Avenue before they reached the checkpoint and that many drivers did avoid the checkpoint by turning onto this road. Officer Taylor stated that he was at the entrance to the Cherokee Motel, and there were officers closer to the tunnel than he was. He said that no law enforcement officers should have been posted between the tunnel and Ashmore Avenue.

Franklin, the Defendant-Appellant, testified that he attended the Riverbend Festival prior to encountering the checkpoint on June 15, 2012. He said he did not see any signs indicating that there was a checkpoint as he entered the tunnel from the south. However, "[a]bout one or two car lengths" after exiting the tunnel, Franklin observed a "sea of blue lights" and saw officers in the road. Franklin stated that the officers were positioned "right at Ashmore [Avenue] . . . in the intersection essentially" and that he never saw any signs stating that he could avoid the checkpoint by turning onto Ashmore Avenue. He said he did not attempt to avoid the checkpoint, and an officer waved him out of the line of cars "right there at Ashmore." He recalled being stopped at Ashmore Avenue because he pulled his car over in front of the porte cochere in front of a pet grooming business, which is at the intersection of Ashmore Avenue and Dayton Boulevard. Franklin asserted that he never had an opportunity to avoid the checkpoint and that he never observed any vehicles turning onto Ashmore Avenue that night.

On October 14, 2013, the trial court entered an order denying the motion to reconsider, stating the following:

> With respect to the issue of entrapment, to the extent that the defendant now suggests that the constitutionality of the checkpoint stop depends on its consensual nature and therefore on the existence of one or more escape routes, which, in this case, is now perhaps more doubtful that it was, the Court respectfully disagrees. State v. Downey, 945 S.W.2d 102, 104 (Tenn. 1997) and State v. Varner, 160 S.W.3d 535, 547 (Tenn. Crim. App. 2004), classify checkpoint stops as suspicionless seizures. Cf. State v.

- 12 -

Moats, 403 S.W.3d 170, 186 n.7 (Tenn. 2013) (noting that, "since the United States Supreme Court decided [Cady v. Dombrowski, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973)], the community caretaking function has been extended to include 'sobriety checkpoints, border searches, drug testing, inventory searches, and searches in public schools'") (citations omitted).

Furthermore, neither Downey nor Varner recognizes a right of avoidance or treats the existence of one or more escape routes as relevant on the issue of the constitutionality of a checkpoint. Presumably, consent would render a Downey analysis redundant.

As for the issue of unpreserved evidence, the defendant does not dispute that the only part of the recording that is inaudible is one or more pre-arrest consultations between trainer and trainee troopers. The Court respectfully disagrees with the defendant that the failure to preserve this evidence entitles him to dismissal of the indictment or a jury instruction on the failure to preserve evidence.

. . . .

The Court finds that the troopers did not have a duty to preserve their consultations. The defendant does not cite and the Court is not aware of any discovery rule that requires the disclosure of such consultations, despite the potential impeachment value of every prior statement. See Tenn. R. Crim. P. 16(a)(1)(G), (a)(2) (conditioning the necessity to disclose the results or reports of examinations, tests, or experiments in part on the existence of the results or reports and generally excepting from disclosure internal state documents and witness statements, respectively). Cf. Tenn. R. Crim. P. 26.2 (requiring production of certain witness statements).

Furthermore, to the extent that the troopers' consultation is relevant, its outcome, the defendant's arrest, indicates that, on the whole, their observations and conclusions were not favorable to him. In [State v. Merriman, 410 S.W.3d 779, 795 (Tenn. 2013),] "[t]he lost evidence was significant because it recorded Ms. Merriman's conduct, which provided the factual basis for her charges." . . . A consultation between trainer and trainee troopers, however, does not have the same significance to the defense as the conduct underlying a charge.

The Court observes that, even if the troopers did have a duty to preserve their consultations and their failure to do so was a matter of policy, as Sgt. Matthews' testimony at the hearing on the original motion to suppress seems to indicate, the defendant's conduct, including his performance on field sobriety tests, was reported in an affidavit of complaint at least and was recorded. There is therefore equally or more reliable substitute evidence on the issues of impeachment and guilt.

In addition, the significance of the troopers' consultation(s) remains low. Although, at the second hearing, Off. Taylor did not testify about the reasons for the defendant's arrest for driving under the influence, at the first hearing, before the sufficiency of the evidence against the defendant was in issue, Sgt. Matthews testified that a video recording was made of the checkpoint and the defendant's field sobriety tests and [Troopers] Collins and Swafford testified that the defendant smelled of alcohol, admitted that he had been drinking, fumbled for his registration, performed poorly on field sobriety tests, and had a blood-alcohol concentration of twelve-hundredths of one percent. The affidavit of complaint, too, recites sufficient cause for the defendant's arrest for driving under the influence: his admission to consumption of two or three drinks, the strong odor of intoxicant on his person, and his performance on field sobriety tests, including swaying, having watery eyes, on the walk-and turn, starting too soon, being unable to keep his balance, stepping from the line one time, and not placing heel to toe several times, and, on the one-leg stand, placing a foot on the ground inappropriately and raising his hands.

**Motion to Dismiss, or in the Alternative, Motion to Exclude.** On January 31, 2014, Franklin filed a motion requesting the trial court to dismiss his case, or alternatively, exclude all evidence related to blood or breath testing. In this motion, Franklin argued that Code section 55-10-413 is unconstitutional because it creates a fee system that violates his right to due process and a fair trial. Franklin's motion was later consolidated for the purpose of argument with the motions of over twenty similarly-situated defendants and heard before the three Hamilton County Criminal Court Judges, sitting en banc.

We note that the companion case on this issue is State v. Rosemary L. Decosimo, No. E2017-00696-CCA-R3-CD, 2018 WL 733218 (Tenn. Crim. App. Feb. 6, 2018), perm. app. granted (Tenn. Mar. 21, 2018). On March 21, 2018, the Tennessee Supreme Court granted the State's application for permission to appeal our decision in Rosemary L. Decosimo on the issue of whether the fee system established in Code section 55-10-413(f) violates due process. State v. Rosemary L. Decosimo, No. E2017-00696-SC-R11-

- 14 -

CD (Tenn. Mar. 21, 2018) (order granting the State's application for permission to appeal pursuant to Tennessee Rule of Appellate Procedure 11(a)). Because Franklin's motion on the unconstitutionality of Code section 55-10-413 was consolidated for the purpose of argument with Decosimo's motion as well as the motions other similarly-situated defendants, the proof offered at Franklin's motion hearing is substantially the same as that offered at Decosimo's motion hearing, and a detailed summary of this proof can be found at Rosemary L. Decosimo, 2018 WL 733218 at *1-6.

**Denial of Motion to Dismiss, or in the Alternative, Motion to Suppress.** On December 11, 2014, the three Hamilton County Criminal Court Judges, sitting en banc, entered an order denying the motion but granting the defense's request for a jury instruction. In this order, the trial court made the following findings of fact and conclusions of law:

> [W]hat the Court must determine is whether the statute in issue creates such pressure on TBI forensic scientists and expert witnesses that admission of their evidence deprives defendants of due process or a fair trial.
>
> The statutory financial interest is not negligible. It is true that, in any one case, the interest is small. Were there no statute, i.e., were there no reason to consider more than one case at a time, thorough cross-examination and jury instruction would suffice to preserve a defendant's rights to due process and a fair trial.
>
> The statute, however, not only creates a contingent-fee system, like the one in Brown [v. Edwards, 721 F.2d 1442 (5th Cir. 1984),]; it creates a contingent-free-dependent system. In the aggregate of cases, the financial interest is very large. The statutory fees fund laboratory positions, equipment, professional development, and more.
>
> Arguably, the statutory, contingent-fee dependent system encourages both personal and institutional bias in scientific work much of the value of which even the state recognizes depends on the lack of influence on the scientist. Apparently, too, such a system is unnecessary, the state not disputing the existence of acceptable alternatives. Furthermore, that the parties do not cite and the Court does not find any precedent for giving forensic scientists and laboratories a statutory financial interest in DUI convictions suggests that other states, who, presumably, share this state's legitimate goal of discouraging DUI in part by making offenders responsible for laboratory costs, do not regard such an interest as fair.

- 15 -

Despite the magnitude of the aggregate financial interest, however, the Court concludes that it does not necessitate the exclusion of the results of breath or blood tests. Presumably, it is impossible to calibrate breath-test machines to overstate any positive result. Thus, no financial interest on the calibrator's part can affect the results of breath tests.

As for blood tests, presumably, despite the evidence of acknowledged and unacknowledged errors in blood tests, it is impossible to calibrate blood-test machines to overstate any positive result. The sole acknowledged error in the record was a transposition error; perhaps the unacknowledged errors in the record lie within the margin of error. Presumably, too, despite the statement in the reports in the record that "[t]he above represents the interpretations and opinions of the analyst[,"] blood tests are subject to minimal, if any, interpretation or opinion.

Although deliberate falsifications attributable to financial interest remain a possibility, presumably, what protects defendants from accidental transposition errors also protects them from deliberate falsifications: the availability of independent analysis of blood, at state expense in appropriate cases, and the availability of underlying "technical notes and data" that, according to a statement in the reports in the record, the laboratory maintains in its case records. Thus, the financial interest in obtaining DUI convictions is offset by financial and other interests in continuing to have employment and avoiding criminal liability, making the possibility of a deliberate falsification attributable to financial interest remote without necessarily changing defendants' calculations regarding the advisability of independent analysis.

**Denial of Application for Interlocutory Appeal.** Following entry of the December 11, 2014 order, Franklin and the other defendants filed a consolidated motion for an interlocutory appeal, which the trial court granted. Thereafter, this court denied the defendants' application for an interlocutory appeal, and the Tennessee Supreme Court denied the defendants' application to appeal from this court's order of denial. The State also filed a motion for an interlocutory appeal regarding the trial court's decision to grant a jury instruction regarding the $250 BADT fee, but this motion was denied by the trial court on the grounds that the motion was untimely, that another hearing on the State's motion would subject the defendants to additional and unnecessary burden and expense, and that the State could file an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. Following the denial of the interlocutory appeal, the trial judge assigned to Franklin's case recused himself from the case, and the case was reassigned to another Hamilton County Criminal Court judge.

**Trial.** The evidence at Franklin's trial substantially conformed to the evidence presented that the suppression hearing. During trial, TBI Special Agent Kelly Hopkins testified that she tested Franklin's blood sample and determined that it had a BAC of 0.12%. She noted that Franklin declined to request an independent test of his sample. Agent Hopkins explained that defendants convicted of DUI were assessed a $250 fee that helped defray the costs of testing blood samples. She said that she did not personally benefit from this $250 fee, that the money from this fee went into the TBI general fund, and that she was a salaried employee who did not receive more or less money based on the results of the tests she performed. However, Agent Hopkins acknowledged that she had not read the statute creating this $250 fee and did not know how the money from this $250 fee was used because information about these fees was not shared with TBI employees. Agent Hopkins said she had tested "thousands" of blood samples and had testified on behalf of both the prosecution and the defense. She added that her employment with the TBI would be terminated if she falsified any test result. Hopkins said the TBI's crime labs in Memphis, Nashville, and Knoxville were accredited November 2014 by ASCLD Lab International and that prior to that date, the labs were ASCLD Lab Accredited. She said these different accreditations reflected different standards related to competency of testing and calibration for laboratories.

Franklin also testified, asserting that he consumed three drinks over the entire night of June 15, 2012.

Following the presentation of proof, the defense requested the following special instruction regarding the TBI's conflict of interest regarding the $250 fee for blood or breath tests:

> I charge you that in considering the credibility of the Tennessee Bureau of Investigation (TBI) expert witness, Kelly Hopkins, you may consider whether her testimony was influenced in any manner by the fact that her employer (TBI) receives two hundred fifty to three hundred fifty dollars ($250.00-$350.00) for each Driving Under the Influence conviction under T.C.A. § 55-10-401 where she analyzes a sample of the defendant's blood.

After the trial court provided its own jury instruction on this issue, which follows, the defense objected to it because it failed to identify Agent Kelly Hopkins. The court overruled this objection and provided the following instruction on this issue to the jury at trial:

> Credibility of witnesses. It is your job to decide what the facts of this case are. You must decide which witnesses you believe and how

- 17 -

important you think their testimony is. You do not have to accept or reject everything a witness said. You are free to believe all, none, or part of any person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and everyday experience. There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions.

. . . .

Nine, does the witness or the witness's employer have a financial interest in the defendant's conviction. State law provides that upon conviction for driving under the influence, a motorist who submitted to a blood alcohol test must pay, in addition to all other fines, fees, costs and punishments now prescribed by law, a fee of $250, which goes to the Tennessee Bureau of Investigation to fund forensic scientist positions, to employ[] forensic scientists to fill the positions, to purchase equipment and supplies, pay for education, training and scientific development of employees, or for any other purpose so as to allow the Bureau to operate in a more efficient and expeditious manner, and, to the extent that additional funds are available, employ[] personnel, purchase equipment and supplies, pay for the education, training and scientific development of employees, or any other purpose so as to allow the bureau to operate in a more eff[i]cient and expeditious manner.

## ANALYSIS

**I. Denial of Motion to Suppress.** Franklin argues that the trial court erred in denying his motion to suppress on the ground that the checkpoint was unconstitutional. Specifically, he claims that the checkpoint violated the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution because it failed to comply with the Order and because it violated the standards for checkpoints established in Tennessee case law. The State counters that the checkpoint constituted a reasonable seizure and that the trial court properly denied the motion to suppress.

A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 28 S.W.2d 18, 23 (Tenn. 1996). The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. Moreover, "[q]uestions of

credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. Despite the deference given to trial court's findings of fact, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015) (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider not only the proof offered at the suppression hearing but also the evidence presented at trial. State v. Bishop, 431 S.W.3d 22, 34-35 (Tenn. 2014).

Both the Fourth Amendment of the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). The Tennessee Supreme Court has concluded that article I, section 7 of the Tennessee Constitution is "identical in intent and purpose" with the Fourth Amendment. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001) (citing State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); State v. Vineyard, 958 S.W.2d 730, 733 (Tenn. 1997)).

The essence of this protection against unreasonable searches and seizures "is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Downey, 945 S.W.2d at 106 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). Under the United States Constitution and the Tennessee Constitution, "'a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Hayes, 188 S.W.3d 505, 511 (Tenn. 2006) (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

We recognize that the "the temporary detention of individuals during the stop of a vehicle by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' which implicates the protection of both the state and federal constitutional provisions." Vineyard, 958 S.W.2d at 734; see Yeargan, 958 S.W.2d at 631. While officers must generally possess probable cause or reasonable suspicion that unlawful conduct has occurred in order to stop a motorist, "[a] roadblock seizure . . . is a departure from these fundamental constitutional principles" because "[i]t permits officers to stop and question persons whose conduct is ordinary, innocent, and free from suspicion." Downey, 945 S.W.2d at 104. Consequently, when determining the reasonableness of a

seizure at a checkpoint, "we must balance the public interest served by the seizure with the severity of the interference with individual liberty." Id.

In Downey, the Tennessee Supreme Court held that a sobriety checkpoint that is "established and operated in accordance with predetermined guidelines and supervisory authority that minimize the risk of arbitrary intrusions on individuals and limit the discretion of law enforcement officers at the scene is valid under the Tennessee Constitution." Id. at 112. The court adopted a three-part balancing test, which specified that the reasonableness of a sobriety checkpoint depends on the balancing of "'(1) the gravity of the public concerns served by the seizure, (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty.'" Id. at 107, 110 (quoting Michigan v. Sitz, 496 U.S. 444, 457 (1979)). The State has the burden of establishing the reasonableness of a checkpoint. Hicks, 55 S.W.3d at 535; Varner, 160 S.W.3d at 540. The Downey court held that such seizures are constitutionally permissible so long as "an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field, and the seizure is carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Downey, 945 S.W.2d at 110.

**A.** **Gravity of Public Concerns Served by Checkpoint.** While Franklin concedes that this first factor can be generally satisfied in the case of sobriety checkpoints, he claims that the State's interest in detecting and deterring drunk drivers had diminished for this particular checkpoint site. Cf. State v. Kenneth B. Nevels, No. M2007-00902-CCA-R3-CD, 2008 WL 4071877, at *4-5 (Tenn. Crim. App. Sept. 3, 2008) (recognizing the defendant's argument that the State had to show that intoxicated drivers remained a problem of "grave public interest" in the county where the checkpoint took place but concluding that the defendant failed to present any evidence that the State's compelling interest in detecting and deterring drunk drivers had diminished or that the county at issue was immune to the problem of intoxicated drivers). Franklin asserts that the "lack of statistical support" showing that a checkpoint at this location would address problems regarding drunk driving prevents the State from establishing that intoxicated drivers remained a problem of grave public interest in this area.

Referencing the Order, Section III, which requires that a site location for the checkpoint be chosen "based on historical statistical evidence and the knowledge of alcohol related to other types of crashes where impairment was indicated as a contributing factor," Franklin contends that if a checkpoint is to address the public's concern, then the statistical evidence must show a history of drunk driving in the area. He notes that in this case, the statistical evidence of crashes in the area of the checkpoint showed that there had been zero fatal accidents related to alcohol from 2003 to 2012 and only four alcohol-related accidents resulting in injuries during that same time frame.

Franklin also notes Lieutenant Phillips' testimony that the site for the checkpoint was chosen because crashes had occurred on a parallel highway and not Cherokee Boulevard itself. For these reasons, Franklin contends that the statistical evidence for this checkpoint and law enforcement's concern about the safety on a parallel highway do not support a finding that this checkpoint served the State's compelling interest in detecting and deterring impaired drivers.

In response to these arguments, the State insists that individuals who drink and drive constitute a grave public concern and that this concern was served by the checkpoint in this case. Citing Downey, 945 S.W.2d at 110, it reiterates that the State has a compelling interest in decreasing drunk driving and that checkpoints are an effective tool for detecting impaired drivers. Moreover, as to Franklin's assertion that the statistical evidences does not support Cherokee Boulevard as an acceptable checkpoint site, the State contends that Franklin has failed to provide any authority supporting his claim and that nothing in the Order requires the THP to only consider crashes involving death or injury in determining the site for a checkpoint.

We note that the first Downey factor is satisfied when the State asserts that it has a "compelling interest in detecting and deterring motorists who drive while under the influence of alcohol." Id. at 110. The Downey court specifically recognized that "more deaths and injuries have resulted from such motor vehicle accidents on our nation's highways than from all the wars this country has fought." Id. (citing Sitz, 496 U.S. at 456 (Blackmun, J., concurring)).

At the suppression hearing, the State generally argued that it had a compelling interest in "detecting and deterring DUI drivers." However, given the State's concession at that hearing that no advance public notice of the checkpoint in this case was given, any attempt by the State to rely on the deterrence of impaired drivers as a justification for the checkpoint is substantially diminished. Because the record in this case shows that the State had a compelling interest in detecting impaired drivers, we conclude that this first Downey factor has been established, and we will consider Franklin's arguments regarding the absence of statistical evidence of drunk driving at the checkpoint site under the second Downey factor, which considers the degree to which this particular checkpoint advanced the public interest.

**B.  The Degree to Which the Checkpoint Advanced the Public Interest.**
Franklin also argues that the checkpoint failed to advance the public interest because (1) there was no advance publicity of the checkpoint and (2) the checkpoint was terminated for lack of manpower after a single DUI arrest. He claims that because law enforcement obtained only one DUI arrest after stopping 285 cars over the course of the one-hour checkpoint, the State's interest in reducing impaired driving was not advanced. The State

counters that the checkpoint advanced the public's interest in deterring and detecting impaired drivers.

We note that the second Downey factor, the degree to which the checkpoint advanced the public interest, may be established "when one can fairly say that roadblocks contribute in a meaningful way to achieving the sufficiently compelling state interest [established under the first Downey prong]." Hicks, 55 S.W.3d at 531. In other words, the State must demonstrate "some meaningful link between its establishment [of the roadblock] and the achievement of its compelling interest." Id. at 532. However, the State is not required to show that the checkpoint was the most effective means of achieving its stated goal. Id. at 531.

First, Franklin contends that that the checkpoint in this case failed to advance the public interest given that there was no advance publicity of it. While the State acknowledges that no advance notice was given of the checkpoint, it asserts that the lack of advance publicity does not invalidate the checkpoint.

Franklin references Section III(D) of the Order, which provides the notification requirements for checkpoints:

D. Notification to the Public:

1. The District Attorney of the area in which the sobriety checkpoint is to be conducted should be notified by the District Captain or a designated representative.

2. All local law enforcement agencies within the jurisdiction where the checkpoint is to be held should be notified, and their participation in all activities will be accepted and welcomed.

3. The District Captain, or designated representative, shall prepare a press release for distribution to the local media in the area of the checkpoint, advising that the Tennessee Highway Patrol will be conducting sobriety checkpoints. In urban areas, it may not be possible to notify each news media because of the large number involved. In these cases, the District Captain or designated representative may contact the Public Information Officer (PIO) who is permitted to make checkpoint notifications to media contacts throughout the state.

a. This notification will include the date and county the checkpoint will be held. The notification will also identify the general location the checkpoint will be conducted.

b. This notification will be given no later than two (2) weeks prior to the date the checkpoint is to be held.

c. An example of a press release is attached with this Order.

d. After media notification has been made, it is the responsibility of the site supervisor to verify that each checkpoint has been publicized prior to beginning checkpoint activity.

(1) Checkpoints shall not be conducted unless they have been publicized.

Franklin argues that Section III(D) of the Order was violated because the record clearly shows that there was no advance publicity of the checkpoint. Specifically, he cites to Section III(D)(3)(d)(1), which states, "Checkpoints shall not be conducted unless they have been publicized." He also mentions Section III(D)(3)(d), which provides, "[I]t is the responsibility of the site supervisor to verify that each checkpoint has been publicized prior to beginning checkpoint activity." Franklin also contends that Section III(D)(1) and (2) were violated because the District Attorney and all local law enforcement were never given advance notice of the checkpoint. Although the record shows that the Red Bank Police Department participated in this checkpoint, Franklin contends that the order's requirement that "all local law enforcement agencies within the jurisdiction" be notified of the checkpoint necessarily included the Chattanooga Police Department and the Hamilton County Sheriff's Office, who were never notified of this checkpoint.

At the suppression hearing, THP Captain McGill testified that although the normal procedure was for a media release to be completed, there was no media release done in this case. In addition, THP Lieutenant Phillips testified that although the box on the Activity Report had been checked indicating that the media had been notified, no media notification of the checkpoint had been given. THP Sergeant Matthews, the site supervisor for the checkpoint, admitted that he checked the box regarding the media release on the Activity Report because he assumed that those officers higher in command had notified the media. Following this testimony, the State stipulated that "a media release was not done for this checkpoint." Later in the hearing, the defense admitted a letter from THP Sergeant James Van Dyke, stating that he had searched the records for a media notification for the relevant checkpoint and because had been unable

to such a notification, his "only conclusion [was] that the required media notification of this sobriety checkpoint was not accomplished." We agree with Franklin that the language in Section III(D) of the Order requires media notification, and we conclude that neither Captain McGill, Sergeant Matthews, nor any other individual had the discretion to disregard this requirement.

Franklin also argues that in addition to the specific notice requirements in the Order, several Tennessee cases have emphasized the importance of advance publicity on the basis that advance notice of an impending checkpoint can deter drunk driving. See Downey, 945 S.W.2d at 111 ("We believe advance publicity furthers the deterrence rationale for use of a sobriety roadblock . . . . It is the publicity about roadblocks [that] is the chief means of deterring driving while intoxicated."); Hicks, 55 S.W.3d at 532, 534 (concluding that advance publicity may be essential if the State relies on deterrence as a rationale to support the checkpoint and that advance publicity provides citizens with "the important choice of not exposing themselves to state intrusion without prior suspicion of wrongdoing" and allows citizens to "'anticipate and understand the circumstances' of the stop" (citation omitted)). While acknowledging that the number of DUI arrests does not necessarily indicate the success of a checkpoint because publicity can deter individuals from impaired driving, Franklin argues that the lack of advance publicity of the checkpoint resulted in zero individuals being deterred from drinking and driving on the night in question, which means that the State cannot rely on DUI deterrence when determining whether the checkpoint advanced the public interest.

Second, Franklin argues that the checkpoint failed to advance the public interest because it was terminated after only one DUI arrest. He references the Activity Report, which shows that there was only one misdemeanor arrest for DUI, which was Franklin's arrest, and only one felony arrest. In addition, Franklin argues that Sergeant Matthews' testimony, that he terminated the checkpoint because Trooper Collins and Trooper Swafford had left the scene and because he did not want to keep the Red Bank police officers from their priority calls, undermines the State's claim that the checkpoint advanced the public interest of detecting drunk drivers. He claims that one DUI arrest after stopping 285 cars did not effectively curb impaired driving.

As to this claim, the State, citing the unpublished case of Elliott Aloyo, 2010 WL 596435, at *4, argues that the number of arrests is not determinative of whether a checkpoint advances the public interest. In Elliott Aloyo, this court held that the relevant question is not whether the checkpoint was the most effective way of achieving the State's goal but whether "'one can fairly say [the roadblock] contributes in a meaningful way to achieving the sufficiently compelling state interest.'" Id. (quoting Hayes, 188 S.W.3d at 515). The court also recognized that checkpoints were effective tools for stopping impaired drivers. Id. Based on Elliott Aloyo, the State asserts that the

checkpoint in this case, which took place on Cherokee Boulevard near Highway 27 where several DUI incidents had occurred, prevented accidents and, consequently, advanced the public interest in reducing drunk driving.

Lastly, we consider Franklin's argument from the previous section, that the statistical evidence for this checkpoint and law enforcement's concern regarding the safety on a parallel highway do not support a finding that this checkpoint served the State's compelling interest in reducing drunk driving. While the State acknowledges that the statistical information showed no fatal alcohol-related crashes and only four alcohol-related crashes with injuries, it asserts that Franklin has cited no authority to support his claim that the THP can only consider crashes involving death or injury and that the Order does not contain such a requirement. The State also asserts that the checkpoint, which was chosen from the THP's pre-approved list, was set up on Cherokee Boulevard to prevent impaired drivers from accessing Highway 27 and causing accidents. We agree with both of these arguments.

The record shows that the State generally argued that it had a compelling interest in both "detecting and deterring DUI drivers." We agree with Franklin that the legitimacy of the State's deterrence argument is greatly diminished because the public was never given notice of the impending checkpoint. Removing deterrence as a rationale severely undercuts the State's claim that the searches and seizures at this checkpoint were justified. See Hicks, 55 S.W.3d at 531-32 ("[S]o long as the State chooses to rely on deterrence as a rationale supporting any roadblock, we reiterate that advance publicity of the roadblock may be essential, and in those cases where this factor is absent, the State's ability to rely upon deterrence to justify the stops is correspondingly diminished.").

Therefore, proceeding on the basis that the State's only interest served by the checkpoint was to detect impaired drivers, we must next consider whether the method employed by the State advanced this more limited interest. In considering this issue, we note that the checkpoint resulted in a single arrest for DUI. We also recognize that because of the excessive traffic from the Riverbend Festival, the checkpoint had to be terminated early because officers were waving large numbers of cars through the checkpoint without stopping them. Despite this evidence, we recognize that some minimal proof was presented that suggested that the time and location of the sobriety checkpoint was chosen because of its effectiveness in detecting impaired drivers who had attended the Riverbend Festival. The proof also established that four alcohol-related accidents resulting in injuries had occurred at this location during the period from 2003 to 2012 and that the site for this checkpoint was chosen because crashes had occurred on a parallel highway. Consequently, the site for this checkpoint, which was located on one of the major thoroughfares for traffic exiting the Riverbend Festival, logically relates to the State's interest in detecting impaired drivers. Therefore, we conclude that the sobriety

checkpoint in this case contributed in a meaningful way to achieving the State's interest in detecting impaired drivers in that area on June 15, 2012.

**C.  Severity of the Checkpoint's Interference with an Individual's Liberty or Privacy.**  As for this third Downey factor, Franklin contends that the checkpoint severely interfered with his privacy and liberty because the officers strayed too far from the guidelines of the Order and exercised too much discretion in the operation of the checkpoint.  He reiterates that there was no advanced publicity of the checkpoint, in contravention of the Order.  He also claims that law enforcement exercised too much discretion in failing to place adequate signs warning drivers of the checkpoint, in preventing motorists from avoiding the checkpoint, in determining which cars to stop, in failing to record a discussion between troopers immediately after Franklin's field sobriety tests, and in deciding when to terminate the checkpoint.  In response, the State argues that the lack of advance notice of the checkpoint did not invalidate it and that the checkpoint did not interfere with Franklin's liberty or privacy interests because the officers' discretion at the scene was sufficiently limited.  We conclude that the lack of advance notice, the officers' exercise of substantial discretion at the scene, and the substantial deviations from the Order severely interfered with Franklin's privacy and liberty.

In considering this third Downey factor, this court must determine whether the checkpoint was "'established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene.'"  Id. at 533 (quoting Downey, 945 S.W.2d at 104); see 5 Wayne R. LaFave, Search and Seizure:  A Treatise on the Fourth Amendment § 10.8(d) (5th ed. 2017) ("[A] police procedure is less threatening to Fourth Amendment values when the discretionary authority of the police (and thus the risk of arbitrary action) is kept at an absolute minimum.").

We recognize that "the most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of officers in the field."  Hicks, 55 S.W.3d at 533.  Factors to be considered when determining whether the officers' discretion on the scene was properly limited are the following:  "(1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock."  Id.  The absence of either of these factors will result in the invalidation of the roadblock.  Id.  In all roadblock cases, the State must establish that "some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation."  Id.  "[A]ctive and careful supervision is critical to the constitutional reasonableness of any roadblock[.]"  Id. at 536.  In addition, "[t]he central concern with

suspicionless seizures . . . is not <u>how</u> an officer exercises his or her discretion in the field, but <u>whether</u> he or she exercises an inordinate amount of it" and "[a]ny deviation from established guidelines indicates that an on-site officer's discretion is not properly limited." <u>Varner</u>, 160 S.W.3d at 547.

> There are three steps when evaluating the third <u>Downey</u> factor:
>
> First, the court must decide whether the initial decision to conduct a roadblock was made by an authority superior to the officers in the field. Second, the court must decide whether the officers conducting the roadblock decided for themselves what procedures to use, or if they adhered to neutral standards previously fixed by an administrative decision or regulation. These two steps can be outcome-determinative in that the failure to abide by <u>Downey</u> and its progeny with respect to either necessarily terminates our inquiry and invalidates the stop. But if the roadblock at issue survives the first two steps, the court then examines the execution of the roadblock to determine if it has the other characteristics of a constitutionally permissible roadblock. However, unlike in the first two steps, the presence or absence of a particular characteristic is not necessarily outcome-determinative.

<u>Elliott Aloyo</u>, 2010 WL 596435, at *6.

**1. <u>Decision to Establish the Checkpoint.</u>** This first step is satisfied because the decision to set up the checkpoint was not made by the officers who worked at the checkpoint. Here, the request for the checkpoint and the site for the checkpoint were chosen in advance by THP Captain McGill and Lieutenant Phillips, neither of whom were present during the operation of the checkpoint. Because the decision to establish the checkpoint, as well as its time and location, was not made by an officer who executed the checkpoint, we conclude that the first step, as outlined in <u>Elliott Aloyo</u>, is established.

**2. <u>Discretion Given to the Officers On the Scene.</u>** For the second step, we must consider whether the officers on the scene decided for themselves the procedures to be used in operating this checkpoint. Our review of the video recording of the checkpoint shows that officers were not stopping all cars in both directions, even though they were instructed to do so by site supervisor Sergeant Matthews in accordance with the Request/Authorization form. While the officers appeared to be stopping all south-bound traffic, officers checking the north-bound traffic were, at times, stopping every other car or every third car and were intermittently waving all cars through before eventually returning to momentarily stop cars at random intervals. <u>See</u> <u>Downey</u>, 945 S.W.2d at 111 ("[T]he question of which vehicles to stop at the roadblock should not be left to the

unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision." (internal quotation marks and citation omitted)). Although the State claims that officers, in accordance with the Order, failed to stop every car only when traffic at the checkpoint became congested, the video recording of the checkpoint simply does not support this claim. Instead, this video recording shows that officers checking traffic in the north-bound lane were utilizing their discretion to intermittently stop every other car, to stop every third car, and to wave large numbers of cars through without regard to the actual traffic congestion on the road.

The video recording of the checkpoint also shows that it was being operated for purposes other than a sobriety checkpoint. At the suppression hearing, Sergeant Matthews testified that he instructed all officers during the pre-checkpoint briefing to momentarily stop every vehicle and that if they did not observe any signs of impairment or another violation, to allow the vehicle to pass through the checkpoint. However, the video recording of the checkpoint shows that most, if not all officers, were checking for expired tags during these momentary stops of motorists. Because checking for expired tags is entirely unrelated to the State's asserted interest in detecting impaired drivers, we conclude that the officers at this checkpoint were "pursuing investigatory agendas that were wholly distinct and apart from the State's claimed interest." Hicks, 55 S.W.3d at 537. Moreover, the fact that illegitimate objectives were being pursued during the checkpoint is a "reflection of the overall failure by law enforcement officers to establish this roadblock in a manner consistent with administrative and supervisory oversight." Downey, 945 S.W.2d at 111. We reiterate that "[w]hen police officers are permitted, either through administrative design or supervisory neglect, to actively engage in suspicionless investigation of criminal activity wholly unrelated to the purposes of the checkpoint, the constitutional protections afforded by [a]rticle I, section 7 are rendered utterly without effect or meaning." Hicks, 55 S.W.3d at 538.

Finally, the appellate record shows that Sergeant Matthews failed to properly supervise the conduct of the officers at the checkpoint. The record shows that Sergeant Matthews had absolutely no interaction with Franklin prior to his arrest. At the suppression hearing, Sergeant Matthews was unable to recall his exact location at the time Franklin came through the checkpoint, although he stated that he was "probably in the road." The video recording of Franklin's field sobriety tests and arrest show that Trooper Collins and Trooper Swafford were the only officers who interacted with Franklin. Trooper Collins and Trooper Swafford, a trainee, utilized their own discretion in conducting field sobriety tests and in determining whether to arrest Franklin. All of

- 28 -

these issues weigh against the reasonableness of this checkpoint and lead us to conclude that the second step in <u>Elliott Aloyo</u> has not been established.[1]

      **3.  <u>Characteristics of the Checkpoint.</u>**  Although we have already held that the second step was not established, which automatically results in the invalidation of the checkpoint, we will nevertheless consider the third step in <u>Elliott Aloyo</u>, whether this checkpoint had the characteristics of a constitutionally permissible roadblock, in order to conclusively determine the validity of the checkpoint in this case.

      The Tennessee Supreme Court identified several factors that minimized the risk of arbitrary intrusions on liberty and privacy and supported a finding that a checkpoint is constitutionally permissible, including:

> (1) stopping all cars traveling in both directions, unless congested traffic requires permitting motorists to pass through; (2) taking adequate safety precautions, such as warning approaching motorists of the roadblock and stopping cars only in a safe and visible area; (3) conducting the roadblock with uniformed officers and marked patrol cars with flashing emergency lights; and (4) providing advanced publicity of the roadblock to the public at large, separate from, and in addition to, any notice warnings given to approaching motorists.

<u>Id.</u> at 533 (citing <u>Downey</u>, 945 S.W.2d at 110-12).  While each of these four factors weighs heavily in determining the overall reasonableness of a checkpoint, the absence of any one of these factors does not necessarily invalidate a checkpoint.  <u>Id.</u>

---

[1] Although Franklin claims that law enforcement exercised too much discretion in the operation of the roadblock by preventing motorists from avoiding the roadblock, by failing to preserve the discussion between Trooper Collins and Trooper Swafford immediately after Franklin's field sobriety tests, and by deciding when to terminate the roadblock, we do not believe these issues interfered with Franklin's liberty or privacy.  The record shows that the officers provided an avoidance route for the roadblock and that the site supervisor had the discretion to terminate the roadblock if it caused a hazardous condition.  As to Franklin's claim that the officers' decision to turn off their microphones when discussing his field sobriety tests was yet another exercise of excessive discretion in violation of <u>State v. Ferguson</u>, 2 S.W.3d 912 (Tenn. 1999), we note that Franklin has presented no authority showing that the troopers were required to include the audio portion of their discussion in the recording, and the Order includes no requirement that discussions between officers must be recorded.  <u>Id.</u> at 917.  In addition, no evidence was presented regarding the degree of negligence in failing to include this discussion in the recording or the significance of the "destroyed" evidence in light of the probative value and reliability of secondary or substitute proof.  <u>Id.</u>  Finally, because the record included the video recording of Franklin's performance on the field sobriety tests as well as his BAC result of .012%, we must conclude that there was other evidence presented at trial that was sufficient to support Franklin's conviction.  <u>Id.</u>

Initially, we recognize that the officers at this checkpoint were in uniform, were wearing reflective vests, and were using flashlights to direct traffic. In addition, there were marked patrol cars with flashing emergency lights at the scene. Nevertheless, the remaining three factors, which served to minimize the risk of arbitrary intrusions on liberty and privacy, were absent from this checkpoint.

First, we have already noted that the officers failed to stop all cars traveling in both directions in violation of the Order and the requirements of the Request/Authorization form. Because the officers had nearly unfettered discretion in determining which cars to stop, this weighs against a finding that the checkpoint was constitutionally permissible.

Second, the record shows that the officers failed to warn motorists of the checkpoint before entering the tunnel and failed to stop cars only in a safe and visible area. We note that the site of the checkpoint, which was set up just outside a tunnel with no warning signs prior to the entrance of the tunnel, was chosen with little thought to the safety of motorists and the officers conducting the checkpoint. Although it is clear the officers sought to use the tunnel to disguise the checkpoint until the last possible moment, the record shows that traffic frequently became congested inside the tunnel, putting both the motorists and officers at risk for accidents and injuries. Although the State admits that there were no signs posted before drivers entered the tunnel on Cherokee Boulevard, it contends that the checkpoint was not placed immediately outside the north side of the tunnel and that officers did not allow traffic inside the tunnel to become congested for safety reasons. Although the record provides limited information as to the exact location of the checkpoint, it does indicate that the checkpoint was located only a short distance from the exit of the tunnel. We strongly question whether tunnels, which provide the motorists limited space in which to avoid accidents and place officers and motorists at increased risk of harm, should ever be utilized to conceal checkpoints. Notwithstanding that concern, we conclude that the officers' failure to post warning signs prior to entering the tunnel undoubtedly prevented motorists from having adequate notice of the impending checkpoint. Adequate warning signs at the entrance of the tunnel not only would have increased motorists' safety but also would have "'reassure[d] motorists that the stop [was] duly authorized,' thereby diminishing the possibility of surprise, concern, or fright." Id. at 534 (quoting Ingersoll v. Palmer, 743 P.2d 1299, 1316 (Cal. 1987)). The absence of adequate warning signs at the entrance to the tunnel and the officers' failure to stop cars a safe distance away from the tunnel leads to a conclusion that adequate safety precautions were not taken in this checkpoint and weighs against a finding that the checkpoint is constitutionally permissible.

Third, the record shows that no advance publicity was given to the public at large regarding this checkpoint. In considering this factor, we recognize that "the advance

publicity requirement of <u>Downey</u> was not merely an afterthought or a constitutionally needless restriction upon otherwise legitimate law enforcement activity." <u>Id.</u> at 534. While advance publicity of a checkpoint often provides an important deterrence function by encouraging individuals not to drive while impaired, advance publicity also has the effect of giving citizens "the important choice of not exposing themselves to state intrusion without prior suspicion of wrongdoing." <u>Id.</u> Moreover, citizens who know that they may be stopped at a checkpoint can better "'anticipate and understand the circumstances' of the stop." <u>Id.</u> (quoting <u>Jones v. State</u>, 459 So.2d 1068, 1076 (Fla. Dist. Ct. App. 1984)). While the absence of advance publicity will not always invalidate a checkpoint if other measures assure the reasonableness of the stop, we agree that the publicity requirement in <u>Downey</u> is a "key aspect of a minimally intrusive roadblock," <u>id.</u>, and its importance cannot be diminished. The fact that several factors minimizing the risk of arbitrary intrusion were absent from this checkpoint weighs heavily against a finding that this checkpoint was constitutionally reasonable.

In addition to our analysis of the <u>Hicks</u> factors, we also recognize that this checkpoint was not "established and operated in accordance with predetermined operational guidelines[.]" <u>Downey</u>, 945 S.W.2d at 104. Although the Tennessee Highway Patrol issued administrative guidelines for sobriety checkpoints in its Order, the record shows that the following deviations from the Order occurred with regard to the checkpoint in this case:

> (1) The site for the roadblock was not selected based on motorist and officer/member safety and did not ensure that adequate visibility for oncoming motorists was provided—Order, III(A)(2).
> (2) The site location did not give motorists adequate prior warning that a checkpoint was ahead—Order, III(A)(2)(b).
> (3) The deterrent effect created by the operation of the sobriety checkpoint was not considered because no advance publicity of the checkpoint was done—Order, III(A)(2)(i).
> (4) The Troop Lieutenant failed to personally inspect the site location to ensure compliance with this Order—Order, III(B)(3).
> (5) The District Captain failed to ensure that the site location met the criteria to be satisfied when choosing site locations—Order, III(b)(5).
> (6) The District Captain failed to prepare a press release for distribution to the local media in the area of the checkpoint advising that the Tennessee Highway Patrol would be conducting sobriety checkpoints—Order, III(D)(3)
> (7) The site supervisor failed to enter all activity, in its entirety, into the Checkpoint Activity System and failed to submit a copy of the Activity

Report through the chain of command to the District Captain for this checkpoint—Order, IV(A)(1).

These substantial deviations from the Order highlight the fact that the checkpoint was not "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Id. at 110. Moreover, these deviations from the Order establish that officers' discretion was not adequately limited at this checkpoint. Because "genuine limitations on the officers' discretion [are] an essential component of the roadblock exception to Article I, section 7 [of the Tennessee Constitution]," id., we conclude that the failure of the THP to follow the administrative guidelines weighs against the constitutional reasonableness of this checkpoint.

For all these reasons, we conclude that the checkpoint in this case violates the Fourth Amendment and article I, section 7 of the Tennessee Constitution. The State has failed to show that the checkpoint was established and operated in accordance with predetermined operational guidelines or with supervisory authority that minimized the risk of arbitrary intrusion on liberty and limited the officers' discretion at the scene. Because the trial court erred in denying Franklin's motion to suppress, we reverse the judgments of the trial court, vacate the judgments of conviction, and dismiss all charges arising from Franklin's stop at this checkpoint.

**II. Batson Challenge.** Franklin, who is Caucasian, also contends that the trial court erred in overruling his Batson challenges during jury selection. See Batson, 476 U.S. at 96-98. He asserts that the jury pool included only two African-American jurors, Ms. Henderson and Ms. Williams, who were excused after the State exercised peremptory challenges against these two jurors. Franklin specifically claims that the reasons given by the State were not sufficiently race-neutral and that the State's purposeful discrimination of these jurors violated Batson. The State counters that it provided race-neutral reasons for challenging Ms. Henderson and Ms. Williams and that it never discriminated against them based on race.

The Equal Protection Clause of the United States Constitution prevents the State[2] from exercising peremptory challenges to excuse potential jurors on account of their race. Batson, 476 U.S. at 89; State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006). In Batson, 476 U.S. at 89, the United States Supreme Court held that the State's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates that defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. A few years later, in Powers v. Ohio, 499 U.S. 400, 416 (1991), the

---

[2] The Constitution also prohibits a criminal defendant from exercising its peremptory challenges based on race. Georgia v. McCollum, 505 U.S. 42, 59 (1992).

Court held that a criminal defendant may object to race-based exclusions of jurors through peremptory challenges regardless of whether the defendant and the excluded jurors share the same race.

When a defendant alleges that the State is excluding a juror based on the juror's race, Batson provides a three-step process for determining when a peremptory challenge is discriminatory. 476 U.S. at 96-98; see State v. Kiser, 284 S.W.3d 227, 255 (Tenn. 2009); Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016). The first prong requires the defendant to make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Batson, 476 U.S. at 93-94; Kiser, 284 S.W.3d at 255. A defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94.

If the trial court determines that the defendant has made out a prima facie showing that the peremptory challenge has been exercised on the basis of race, then the second step requires the State to provide a race-neutral explanation for its challenge. Id. at 97; State v. Echols, 382 S.W.3d 266, 281 (Tenn. 2012) (citing Kiser, 284 S.W.3d at 255-56). The State's race-neutral explanation "must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge . . . [but] need not be persuasive, or even plausible." Hugueley, 185 S.W.3d at 368 (citing Purkett v. Elem, 514 U.S. 765, 767-68 (1995)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.'" Id. (quoting Purkett, 514 U.S. at 768).

If the State offers a race-neutral explanation, then the third prong requires the trial court to determine if the defendant has established purposeful discrimination. Batson, 476 U.S. at 98; see Hugueley, 185 S.W.3d at 368 ("If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination."). When considering this third step, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365 (1991). "[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); see Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) ("Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."). "'The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual.'" Kiser, 284 S.W.3d at 255 (quoting Hugueley, 185

S.W.3d at 368). At this third step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768. If the court finds that the proffered reason is merely pretextual and that the challenge is a racially motivated, then the juror may not be excluded. Kiser, 284 S.W.3d at 255 (citing Hugueley, 185 S.W.3d at 369).

"[T]he ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge." Hugueley, 185 S.W.3d at 374 (citing Batson, 476 U.S. at 93); see also Purkett, 514 U.S. at 768 (recognizing that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). The Tennessee Supreme Court has emphasized the importance of a trial court's findings regarding a Batson violation:

> The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context.

Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996); see Batson, 476 U.S. at 97.

"On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Woodson, 916 S.W.2d at 906; see Foster, 136 S. Ct. at 1747 (noting that the third step in Batson "turns on factual determinations," and that "'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." (citation omitted)). "Deference [to the trial court's findings on the issue of discriminatory intent] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." Miller-El, 537 U.S. at 339.

**Voir Dire.** During the voir dire proceedings in Franklin's case, the prosecutor asked if any of the prospective jurors knew the defendant or his friends or family, and a prospective juror, who identified herself as Ms. Young, stated that she had known Franklin "for years" and knew Franklin's "whole family." Later, the prosecutor and a prospective juror, presumably Ms. Young,[3] had the following exchange:

---

[3] After viewing the voir dire proceedings in their entirety, we can reasonably infer that these statements are attributable Ms. Young.

| [The Prosecutor]: | And this is a slight variation on all of this, I'm going to ask you if there's anyone here who would be uncomfortable standing in judgment. Let's say you would not want to convict Mr. Franklin of DUI, even if the State does what it's supposed to do and proves everything? Anyone feel that they couldn't do that? |
|---|---|
| [Ms. Young]: | I'd have a hard time, I mean— |
| [The Prosecutor]: | Well, yeah, okay, because you know him. Anyone else? And, really, this is the time, you know; don't feel like you can't tell us because this would be the time to tell us. Anyone feel that if the State proves the case, that you just wouldn't want to convict him? |

The transcript does not indicate the prospective jurors' responses to this question. The State then asked the prospective jurors if they had ever driven after drinking, and the following discussion occurred between the prosecutor and Ms. Henderson:

| [The Prosecutor]: | All right. And Ms. Henderson, what do you do in terms of drinking and driving? |
|---|---|
| [Ms. Henderson]: | I try not to drive, drinking, especially if I feel like I overindulged, but I don't want anybody else to drive, so I try not to, but I've been to a restaurant before and had like two drinks and then I would drive, but if I feel like I can't, I always get somebody. |

A short time later, the prosecutor had the following interaction with a prospective juror, presumably Mr. Seaton[4]:

| [The Prosecutor]: | And this borders on possibly embarrassing, but do any members of the jury panel, have you been charged with DUI, ever? Okay. Can you tell us about that, do you mind? And speak up, please. |
|---|---|

---

[4] Again, after viewing the voir dire proceedings and the motion for new trial hearing in their entirety, we can reasonably infer that these statements are attributable to Mr. Seaton.

[Mr. Seaton]:        Would have been 2001, also in the state of Georgia.

[The Prosecutor]:    All right.  And what was the result of—you were stopped for DUI?

[Mr. Seaton]:        Yes.

[The Prosecutor]:    And what happened to the case?

[Mr. Seaton]:        I was convicted of DUI.

[The Prosecutor]:    You were convicted?

[Mr. Seaton]:        Yes.

[The Prosecutor]:    And did you plead guilty to it or—

[Mr. Seaton]:        I believe my attorney pled nolo, I guess.

[The Prosecutor]:    Okay.  All right.  But you pled?

[Mr. Seaton]:        Yes.

[The Prosecutor]:    All right.  Have you had any since then?

[Mr. Seaton]:        No.

[The Prosecutor]:    Did it have any [e]ffect on you to change your habits at all?

[Mr. Seaton]:        Absolutely, especially financially.

[The Prosecutor]:    All right.  But so you haven't been DUI since?

[Mr. Seaton]:        Correct.

[The Prosecutor]:    Okay.  Do you think that that was ultimately a good thing, that you got stopped for a DUI?

[Mr. Seaton]:        Didn't seem so at the time, but, in hindsight, probably.

Thereafter, the prosecutor asked the following question:

> [The Prosecutor]:  All right.  So if you were told that that's your job, whether you liked it or not, would you be able to find Mr. Franklin guilty if the State provided all the elements of the crime beyond a reasonable doubt?  If you would, can you raise your hand?  All right.  Because if you can't, that's not—I mean the purpose of the jury is to weigh the evidence and determine guilt or innocence, okay? .

The voir dire transcript does not indicate the prospective jurors' responses to this question.

Still later, defense counsel asked the prospective jurors if they would "have a problem with listening to the evidence, determining the credibility of witnesses, which will be a big factor in this case, and appl[ying] that evidence to the law that [the trial judge] gives you and then mak[ing] a determination as to guilt or innocence of Bob Franklin?"  Once again, the voir dire transcript does not show the prospective jurors' responses to this question.

Near the conclusion of jury selection, the prosecutor used two of its peremptory challenges to exclude Ms. Henderson and Ms. Williams.  In a hearing outside the presence of the potential jurors, defense counsel made a Batson challenge, asserting that the State had used its peremptory challenges to remove the only two African-American prospective jurors from the panel in what appeared to be a "systematic exclusion" of individuals based on race.  The trial court found that the defense had made a prima facie case of purposeful discrimination and said that it wished to hear from the State.

The prosecutor stated that she excused Ms. Henderson because "[s]he drinks and drives.  It was solely about that."  When the defense said its notes indicated that Ms. Henderson actually said that she had drunk alcohol and driven in the past, but did not drive after drinking now, the prosecutor insisted that "what [Ms. Henderson] said was she tries not to drive while drinking; if she feels like she can't drive, she'll have someone with her.  That is so crucial to the point in this case."  The trial court held that although the defense had made a prima facie showing of purposeful discrimination, the State had provided a "legitimate" race-neutral reason for excusing Ms. Henderson.

As for the other juror, the prosecutor said that when Ms. Williams was "asked if she could judge another person and find somebody guilty of DUI if the State proved their

case, [she] did not raise her hand, where the others did." The defense argued that the State had failed to provide a race-neutral explanation for excusing Ms. Williams because despite the fact that the prosecutor "had every opportunity to pursue" Ms. Williams' purported failure to raise her hand, she "didn't raise an objection to it at the time" and instead "just summarily struck this lady," which did not overcome the defense's prima facie showing.

When the trial court inquired about the State's failure to ask additional questions when Ms. Williams did not raise her hand, the State replied:

> Well, Your Honor, in addition to the things that are asked, we always, all of us, have to look at the attitude that is being put forth from a jury member as well. I look and see if somebody is slouching or if they seem to, like, not want to be here. And, you know, those are some of the things as well, but she—I think it's fairly critical if she is a person who cannot bring herself to judge another person or to find him guilty if the State proves [its] case, that's a critical piece.

When the trial court reiterated the defense's concern that the State failed to question Ms. Williams further when she did not raise her hand, the prosecutor said, "Well, I actually couldn't keep track of everything while I was there answering questions, and I did have help from my helpers." Defense counsel immediately countered that when he asked Ms. Williams whether she could be fair and impartial, she answered it in the positive. He also emphasized that none of the prospective jurors indicated that they had any personal bias or gave any reason why they could not serve as a juror in Franklin's case. For these reasons, defense counsel claimed that the State had failed to overcome the defense's prima facie case of purposeful discrimination. Upon hearing this, the prosecutor insisted that "[n]ot being able to judge somebody [was] a critical piece of being a juror." Ultimately, the trial court determined that although the defense had made a prima facie showing of purposeful discrimination, it was "accept[ing] the statement given by the State" for excusing Ms. Williams and was overruling this Batson challenge, even though it believed that the State "possibly could have gone into [the issue] further." The court observed that the State's reasons for excluding Ms. Williams were not as strong as those for Ms. Henderson, in light of the statements Ms. Henderson made about drinking and driving.

**Motion for New Trial Hearing.** At the motion for new trial hearing, the defense admitted an affidavit from Benjamin McGowan, one of Franklin's attorneys. McGowan's affidavit stated that Charles Seaton, a Caucasian male who ultimately served on and rendered a verdict in Franklin's case, admitted during voir dire that he had received a DUI conviction. The defense argued that McGowan's affidavit established

that the State's exclusion of Ms. Henderson violated <u>Batson</u> because Mr. Seaton, a similarly-situated Caucasian juror, was not also excluded.  The defense noted that the prosecutor failed to ask Mr. Seaton whether he could be fair and impartial despite his DUI conviction before Seaton was seated on the jury.  The prosecutor immediately replied that she did not strike Mr. Seaton, the man with the old DUI conviction, because he had "owned up to what he had done" by pleading guilty and because Mr. Seaton had said that the conviction affected his life for the better.  She said she consistently kept people like Mr. Seaton on her jury panels.  She added that she believed Mr. Seaton's response differed greatly from Ms. Henderson's, who stated that she tried not to drink and drive but sometimes did.

The prosecutor also asserted that "there were actually three people of African-American origin" in the jury pool.  She said that in addition to Ms. Henderson and Ms. Williams, there was a prospective juror named Mr. Collins, who was also African-American.  She stated that "Mr. Collins had a background where he was attentive at all times, he was soft-spoken, because he did respond to some of the things we'd asked, and he just was, his job that he did, everything about him, we were hoping to have Mr. Collins serve [on Franklin's jury]."

The prosecutor stated that she used a peremptory strike to exclude Ms. Williams after her assistant notified her that Ms. Williams failed to raise her hand when asked whether she could convict someone if the State proved its case.  She stated that she did not "have eyes everywhere" and that she did "rely on [her] assistants, because that's why they're there for the jury selection, because there's so much [going on], to looking at my own notes, looking at the people, asking the question[s]."  She stated that one of her assistants who was present during voir dire could testify "from her own mouth [about] the observations that she made of [Ms. Williams] throughout [voir dire]."  The prosecutor added:

> Now, I had noticed some of the same body language, the not wanting to be involved, the never volunteering much, but that particular question, that is a crucial one, it's the most crucial one, because I know, with DUI's, juries sometimes tend to say . . . but for the grace of God, go I, and yes the State proved their case, but I want to give this guy a chance. And, of course, they don't know if the person is an 11th DUI offender or a 1st, but that's what we deal with and so that is the crucial question, the most crucial question, that I ask.
>
> And honestly, I'm not sure that there would be much [of a] follow-up question that would do anything but say, Oh, yeah, well, maybe, but I

think that was a telling issue, when she wouldn't raise her hand to say that yes, if the State proves the elements of the crime, I will convict.

The trial court said that it would allow the prosecutor to present testimony from her assistant. The court then stated, "I think there's case law to the effect that a lot of Batson concerns itself with credibility issues" and that it was "somewhat relying" on the prosecutor's credibility "that this lady didn't raise her hand appropriately."

Later, the court stated, for the record, that it recalled only two African-American prospective jurors on the panel, even though the State claimed there were three African-Americans. It concluded that when the State used two peremptory challenges to exclude both the African-American prospective jurors, the court found that the defense had made a prima facie showing of discrimination. The trial court reiterated its finding that the defendant failed to carry its burden of proving that the State purposefully discriminated against Ms. Henderson. The court recalled Ms. Henderson's admission that she would drink and drive and concluded that the State's decision to exclude Henderson on that basis was not discriminatory.

Still later, Heather Elmore, a DUI secretary for the Hamilton County District Attorney's Office, testified for the prosecution. Elmore said that she often assisted the prosecutor in DUI trials and routinely watched potential jurors during voir dire and took notes regarding their responses to questions. She said that during voir dire in Franklin's case, Ms. Williams did not want to make eye contact with anyone, especially the prosecutor. She noted that Ms. Williams kept "her head down" and her "arms crossed," and "leaned back in the chair" like she did not want to be there. Moreover, Elmore said that Ms. Williams "most definitely did not raise her hand when [she] was asked if she could be in judgment of another person" and that she and another employee, who was also assisting, brought this to the prosecutor's attention. Specifically, Elmore told the prosecutor that Ms. Williams "did not raise her hand, she has been looking down [and] doesn't want to, apparently, be involved." In addition, Elmore maintained that there was another prospective African-American juror on the panel, Mr. Collins, who was a pediatric nurse, and that she and the prosecutor discussed the possibility of eliminating enough other individuals in order to have Collins serve on the jury in Franklin's case. However, she acknowledged that Collins was not actually selected to sit as a juror at Franklin's trial. Elmore said she was unsure whether the prosecutor had already exhausted her three peremptory challenges at the time the jury was chosen.

At the conclusion of the motion for new trial hearing, the trial court noted that it did not personally observe Ms. Williams not raising her hand. The court stated that it was "initially relying on the credibility of [the prosecutor], but she's told us, honestly, how she made that decision, so I accept that." The court then found Heather Elmore "to

be credible in how she explains [Ms. Williams'] actions in regard to raising her hand." The trial court said it did not believe "that a great deal of follow-up would be needed in regard to not raising your hand if you could convict somebody, based on the proof that was presented."

We note that because there was no discriminatory intent inherent in the prosecutor's explanations for the peremptory strikes against Ms. Henderson and Ms. Williams, our analysis in this case will focus on Batson's third step, namely the trial court's determination that the defendant failed to show purposeful discrimination. We also conclude that the record, which includes the voir dire proceeding as well as the motion for new trial hearing, is sufficient for our review.

**A. Juror Henderson.** Franklin contends that the State's explanation for striking Ms. Henderson was pretextual. He claims that if Ms. Henderson's statement about trying not to drink and drive was the actual reason for her exclusion, then there might be a race-neutral basis for striking Ms. Henderson from the jury. However, Franklin asserts, citing United States v. Atkins, 843 F.3d 625, 638 (6th Cir. 2016), that when the circumstances surrounding Ms. Henderson's removal are compared to those of Charles Seaton, a Caucasian juror who admitted to drinking and driving, had a DUI conviction, and served on the jury, then it becomes obvious that the State did not have a race-neutral reason for striking Ms. Henderson.

The State counters that Atkins is distinguishable because Mr. Seaton and Ms. Henderson provided different answers to questions regarding drinking and driving. It asserts that Ms. Henderson knew that drinking and driving was wrong but admitted that she sometimes drove after consuming alcoholic drinks while Mr. Seaton acknowledged that he had faced the consequences of drinking and driving and stated that his DUI conviction had a positive effect on him. The State maintains that, given the disparity in these responses, the trial court properly found that defendant had failed to satisfy his burden of establishing purposeful discrimination.

In Atkins, the Sixth Circuit recognized that a side-by-side comparison of jurors may be necessary when determining whether the prosecution engaged in purposeful discrimination:

> "It is well established that a Batson violation may be shown by disparate treatment of white and minority jurors—that is, if a 'side-by-side comparison[] of some black [potential jurors] who were struck and white ones who were not' shows that the only material distinction between the removed black and the retained white individuals is their race." Torres-Ramos, 536 F.3d at 559 (second alteration in original) (quoting Dretke, 545 U.S. at 241, 125 S. Ct. 2317). In conducting a comparative juror analysis,

the compared jurors need not be "'similarly situated' in all respects." Odeneal, 517 F.3d at 420. In fact, the empaneled white jurors need not even match the stricken black venirepersons in all of the characteristics the prosecution identified in striking the black venirepersons. Dretke, 545 U.S. at 247 n.6, 125 S. Ct. 2317. It suffices that, after reading the "voir dire testimony in its entirety," we find that the differences identified by the prosecution "seem far from significant." Id. at 247, 125 S. Ct. 2317. Additionally, the "failure of the prosecution to inquire regarding a reason purported to be a basis for a [prospective] juror's dismissal serves as evidence of discrimination." Odeneal, 517 F.3d at 421.

Id. at 631-32.

We agree that a side-by-side comparison of African-American panelists who were struck to Caucasian panelists who were allowed to serve as jurors can be helpful in determining whether purposeful discrimination exists. See Miller-El v. Dretke, 545 U.S. 231, 241 (2005). As the United States Supreme Court recognized, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Id.

Here, the prosecutor's sole justification for striking Ms. Henderson was because "[s]he drinks and drives." During voir dire, the prosecutor asked her what she did "in terms of drinking and driving," and Ms. Henderson replied:

I try not to drive, drinking, especially if I feel like I overindulged, but I don't want anybody else to drive, so I try not to, but I've been to a restaurant before and had like two drinks and then I would drive, but if I feel like I can't, I always get somebody.

Later, during voir dire, the prosecutor asked if any of the members of the jury panel had "been charged with DUI," and Mr. Seaton responded that he had been "convicted of DUI" in "2001" in "Georgia." He explained that he pled nolo contendere to that charge and had never been convicted of another DUI. When the prosecutor asked if his DUI made him "change [his] habits," Mr. Seaton said, "Absolutely." The prosecutor then asked him if he believed that his DUI was "ultimately a good thing," and Mr. Seaton replied, "Didn't seem so at the time, but, in hindsight, probably."

After carefully reviewing the record, we believe that Ms. Henderson's and Mr. Seaton's responses were sufficiently different to warrant disparate treatment by the State. While Ms. Henderson admitted to drinking and driving, Mr. Seaton said that his DUI

- 42 -

conviction made him change his habits and affected his life for the better. A close review of the record as a whole indicates that race was not a factor when the State decided to strike Ms. Henderson and to keep Mr. Seaton. See id., 545 U.S. at 252. Accordingly, we conclude that the trial court's finding that Franklin failed to satisfy his burden of proof with regarding to this Batson challenge was not clearly erroneous.

**B. Juror Williams.** Franklin also argues that the prosecution purposefully discriminated against Ms. Williams when it struck her from the jury. Referencing the transcript from voir dire, Franklin argues that the only juror who replied that she could not sit in judgment of the defendant was Ms. Young, a juror who knew Franklin, and that the State's question of "Anyone else?" before continuing with her voir dire questions indicated that no other individuals indicated that they could not sit in judgment of another person. Moreover, he claims that defense counsel asked the potential jurors if they would have a problem applying the evidence to the law before making a determination as to his guilt or innocence and that because the transcript does not show that anyone responded or indicated that they were unable to judge his guilt or innocence, this further contradicts the State's alleged basis for striking Ms. Williams from the jury.

Franklin also asserts that if Ms. Williams had failed to raise her hand in response to the prosecution's questioning or had, in some other way, indicated that she could not sit in judgment of another individual, then the State would have further questioned her, especially if such an indication by Ms. Williams would have bothered the prosecutor enough to want to exclude her from the jury. He asserts that the State's failure to follow up with Ms. Williams constitutes evidence of racial discrimination.

Lastly, Franklin argues that this court must consider the State's reasons for striking Ms. Williams that were provided at the time of the Batson challenge and not the reasons that were provided weeks later at the motion for new trial hearing when the State attempted to justify its actions. See Foster, 136 S. Ct. at 1754. He asserts that Elmore's testimony, which was presented for the first time at the motion for new trial hearing, was presented "in an attempt to justify the striking of Ms. Williams from the panel." Franklin insists that none of the reasons provided by Elmore were given by the State at the time of the Batson challenge of Ms. Williams and that the State's "shifting explanations" make the initial reasons for excluding Ms. Williams even more suspect. See id., 136 S. Ct. at 1751 (noting that "the prosecution's principal reasons for the strike shifted over time, suggesting that those reasons may be pretextual.").

We recognize that a prosecutor's failure to ask additional questions on a topic of concern can suggest that the prosecution's race-neutral explanation is merely pretextual. See Miller-El, 545 U.S. at 244, 246 (recognizing that a prosecutor's failure to ask follow-up questions may suggest purposeful discrimination); Ex parte Travis, 776 So.2d 874,

881 (Ala. 2000) (stating that "the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination."); Atkins, 843 F.3d at 632 (holding that the failure of the State to inquire regarding a reason purported to be a ground for prospective juror's dismissal serves as proof of discrimination). However, the record in this case clearly shows that Ms. Williams' failure to raise her hand was noticed by Heather Elmore, the prosecutor's assistant, and not the prosecutor herself, which explains why the prosecutor did not ask any follow-up questions of Ms. Williams at the time that Ms. Williams failed to raise her hand. The record further shows that the prosecutor relied on Elmore's statement to her during a break in voir dire before exercising the peremptory challenge against Ms. Williams. When evaluating this Batson challenge, the court determined that the prosecutor had been "honest" about how she discovered Ms. Williams' failure to raise her hand before concluding that Elmore was "credible in how she explain[ed] [Ms. Williams'] actions in regard to raising her hand." Consequently, we conclude that the prosecution's claims regarding Ms. Williams' failure to raise her hand are fully supported by the record.

We also acknowledge that a prosecutor's shifting explanations for a juror's removal can provide evidence of purposeful discrimination. See Miller-El, 545 U.S. at 246 (stating that the State's new explanation for excusing the African-American juror, after the prosecutor's misrepresentations of that juror's responses during voir dire were brought to light, "reek[ed] of afterthought"). Despite Franklin's claims that the prosecution's justifications for striking Ms. Williams changed over time, a review of the record shows that the prosecutor never wavered in her explanations for exercising the peremptory strike against Ms. Williams. The prosecutor asserted during voir dire that (1) Ms. Williams had failed to raise her hand in response to whether she would be able to find Franklin guilty if the State proved its case and (2) Ms. Williams' body language indicated that she did not want to serve as a juror. The record shows that the State asserted these same explanations at the motion for new trial hearing. Moreover, Elmore's testimony corroborated that these race-neutral reasons were why the prosecution chose to exercise a peremptory challenge against Ms. Williams.

Although non-verbal communication, such as demeanor or inattentive behavior, can form a race-neutral basis for a peremptory strike, we recognize that race-neutral explanations based on subjective assessments "must be carefully scrutinized." State v. Carroll, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000) (citing United States v. Jenkins, 52 F.3d 743, 746 (8th Cir. 1995); United States v. Sherrills, 929 F.2d 393, 395 (8th Cir. 1991)). Of particular significance in this case was the fact that the trial court did not observe Ms. Williams' failure to raise her hand. The United States Supreme Court, while acknowledging that a trial judge's "firsthand observations" of a juror's demeanor are of substantial importance when evaluating the prosecution's explanation for a peremptory

strike, held that "no decision of this Court" has held that "a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor." Thaler v. Haynes, 559 U.S. 43, 48-49 (2010). Instead, it recognized that even "in the absence of a personal recollection of the juror's demeanor," a trial judge can accept a prosecutor's explanation as race-neutral. Id. at 49; see State v. Mark Lee Dale, No. M2001-01205-CCA-R3-CD, 2002 WL 1204933, at 3 (Tenn. Crim. App. June 5, 2002) (concluding that although neither the trial court nor defense counsel observed the body language cited by the State in its explanation, the trial court did not err in accrediting the prosecution's claim that the strike was exercised on a race-neutral ground").

In this case, Elmore's detailed testimony at the motion for new trial hearing gives credence to the prosecutor's assertion that Ms. Williams failed to raise her hand when asked if she could convict Franklin in the event that the State proved its case. The record is clear that the trial court accredited the prosecutor's and Elmore's explanations for the strike on the basis of Williams' non-verbal conduct, both her failure to raise her hand and her body language. Because the State's explanations for excusing Ms. Williams were neither implausible nor unreasonable and were fully supported by the record, we conclude that the trial court's ruling with regard to this juror was not clearly erroneous.

**III. Denial of Motion to Dismiss, Or In the Alternative, Motion to Exclude.** Lastly, Franklin argues that because Tennessee Code Annotated section 55-10-413(f) (2017), which gives the TBI $250 for each DUI conviction that is obtained using a blood or breath test, is unconstitutional, the trial court erred in denying his motion to dismiss, or in the alternative, to exclude the evidence on that basis. He specifically asserts that Code section 55-10-413(f) (2017) violates his right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, sections 8 and 9 of the Tennessee Constitution because it creates a "contingent-fee-dependent system" that gives the TBI and its forensic scientists a financial incentive to ensure convictions. Franklin also asserts that the jury instruction given by the trial court failed to remedy the unconstitutionality of Code section 55-10-413(f) (2017). Finally, he claims Code section 55-10-413(f) (2017) violates the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution prohibitions against excessive fines. The State counters that the trial court properly denied Franklin's motion because Code section 55-10-413(f) (2017) is constitutional. We conclude that because Code sections 55-10-419 (2012) and 55-10-413 (2013-2017) violate principles of due process, the trial court erred in failing to grant the motion to exclude the test results in this case.

At the time of Franklin's arrest, Code section 55-10-419 (2012), which imposed a $250 BADT fee for blood and breath tests and required the deposit of this fee into the TBI's toxicology unit intoxicant testing fund, provided:

(a)(1) In addition to all other fines, fees, costs and punishments now prescribed by law, including the fee imposed pursuant to § 55-10-403(h), a blood alcohol or drug concentration test (BADT) fee in the amount of two hundred and fifty dollars ($250) shall be assessed upon a conviction for a violation of § 39-13-106, § 39-13-213(a)(2), § 39-13-218, § 39-17-418, § 55-10-205 or § 55-10-401, for each offender who has taken a breath alcohol test on an evidential breath testing unit provided, maintained and administered by a law enforcement agency for the purpose of determining the breath alcohol content or has submitted to a chemical test to determine the alcohol or drug content of the blood or urine.

(2) In addition to all other fines, fees, costs and punishments now prescribed by law, including the fee imposed pursuant to § 55-10-403(h), a blood alcohol or drug concentration test (BADT) fee in the amount of one hundred dollars ($100) shall be assessed upon conviction for a violation of § 39-13-106, § 39-13-213(a)(2), § 39-13-218 or § 55-10-401, if the blood or urine of the convicted person was analyzed by a publicly funded forensic laboratory or other forensic laboratory operated by and located in counties having a population of not less than eighty-seven thousand nine hundred (87,900) nor more than eighty-eight thousand (88,000), according to the 2000 federal census or any subsequent federal census, for the purpose of determining the alcohol or drug content of the blood.

(b)(1) The fee authorized in subdivision (a)(1) shall be collected by the clerks of the various courts of the counties and forwarded to the state treasurer on a monthly basis for deposit in the Tennessee [B]ureau of [I]nvestigation (TBI) toxicology unit intoxicant testing fund created as provided in subsection (c), and designated for exclusive use by the TBI for the purposes set out in subsection (c).

(2) The fee authorized in subdivision (a)(2) shall be collected by the clerks of the various courts of the counties and shall be forwarded to the county trustees of those counties on a monthly basis and designated for the exclusive use of the publicly funded forensic laboratory in those counties.

(c)(1) There is created a fund within the treasury of the state, to be known as the TBI toxicology unit intoxicant testing fund.
(2) Moneys shall be deposited to the fund pursuant to subsection (b), and as may be otherwise provided by law, and shall be invested pursuant to § 9-4-603. Moneys in the fund shall not revert to the general fund of the state,

but shall remain available for appropriation to the Tennessee bureau of investigation, as determined by the general assembly.

(3) Moneys in the TBI toxicology unit intoxicant testing fund and available federal funds, to the extent permitted by federal law and regulation, shall be used to fund a forensic scientist position in each of the three (3) bureau crime laboratories, to employ forensic scientists to fill these positions, and to purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner. To the extent that additional funds are available, these funds shall be used to employ personnel, purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner.

T.C.A. § 55-10-419 (2012) (emphases added)[5]; see id. § 55-10-413(f) (2013-2017) (including similar provisions to T.C.A. § 55-10-419 (2012)).

On May 21, 2018, shortly after our decision on this issue in the companion case of Rosemary L. Decosimo, 2018 WL 733218, the General Assembly amended Code section 55-10-413 to require that the $250 BADT fee be deposited into the state general fund rather than the TBI's intoxicant testing fund:

(f)(1) In addition to all other fines, fees, costs, and punishments now prescribed by law, including the fee imposed pursuant to subsection (d), a blood alcohol or drug concentration test (BADT) fee in the amount of two hundred fifty dollars ($250) shall be assessed upon a conviction for driving under the influence of an intoxicant under § 55-10-401, vehicular assault under § 39-13-106, aggravated vehicular assault under § 39-13-115, vehicular homicide under § 39-13-213(a)(2), simple possession or casual exchange of a controlled substance under § 39-17-418, reckless driving under § 55-10-205, or aggravated vehicular homicide under § 39-13-218, for each offender who has taken a breath alcohol test on an evidential breath testing unit provided, maintained, and administered by a law enforcement agency for the purpose of determining the breath alcohol

---

[5] On July 1, 2013, this section of the code was transferred from Code section 55-10-419 to Code section 55-10-413. In 2016 and 2017, the legislature made minor amendments to Code section 55-10-413, although the provisions regarding the $250 BADT fee for blood and breath tests and its deposit into the TBI toxicology unit intoxicant testing fund remained the same.

- 47 -

content or has submitted to a chemical test to determine the alcohol or drug content of the blood or urine.

(2) The fee authorized in subdivision (f)(1) shall be collected by the clerks of the various courts of the counties and forwarded to the state treasurer on a monthly basis for deposit in the state general fund, to be used only as appropriated by the general assembly.

(3) Any moneys in the TBI toxicology unit intoxicant testing fund as of June 30, 2018, shall revert to the general fund on such date, to be used only as appropriated by the general assembly.

T.C.A. § 55-10-413(f)(1)-(3) (effective May 21, 2018) (emphases added).

Because Franklin's arguments regarding the unconstitutionality of Code section 55-10-413(f) are substantially the same as those raised in Rosemary L. Decosimo, we adopt the law and analysis from our decision in that case and incorporate it here. See Rosemary L. Decosimo, 2018 WL 733218, at *8-18. After reviewing the record in this case, we conclude that Code sections 55-10-419 (2012) and 55-10-413 (2013-2017) violate principles of due process.

While the State contends that any possible bias on the part of forensic scientists can be offset by procedural safeguards, such as an independent testing of samples, a thorough cross-examination of the forensic scientist at trial, or a jury instruction addressing the credibility of TBI forensic scientists, we conclude that these procedural safeguards fail to remedy the due process violations resulting from the fee system itself. Cf. Ward, 409 U.S. at 61-62 (rejecting the claim that the procedural safeguards of an appeal and trial de novo corrected the due process violation); Brown, 637 F.2d at 280 (recognizing that an accused has a right to an unbiased magistrate or judge with or without a jury and with or without the right to appeal and a trial de novo before a jury); see also City of White House v. Whitley, 979 S.W.2d 262, 267 (Tenn. 1998) (concluding that "the due process violation resulting from the lack of an attorney judge is not cured by the statutory right to a de novo appeal."). We conclude that independent testing is not an adequate safeguard because it impermissibly shifts the burden of proof from the State to the defense. Because the State has the duty to pursue truth and justice, it has the obligation to provide an accurate, unbiased BAC result, not a result that is deemed correct until disproved by the defendant. Under the scenario suggested by the State, the defendant is forced to obtain an independent test, to pay for an attorney to defend him, and to hire an expert to challenge the BAC result in order to do what an unbiased TBI forensic scientist should have done from the beginning. Lastly, because so many DUI

cases end in guilty pleas, rather than trials, we conclude that neither a jury instruction nor vigorous cross-examination of TBI forensic scientists corrects the fact that Code sections 55-10-419 (2012) and 55-10-413 (2013-2017) violate due process. Accordingly, we hold that the trial court erred in failing to exclude the test results in this case.

Finally, Franklin contends that the $250 fee created by Code sections 55-10-419 (2012) and 55-10-413 (2013-2017) is an excessive fine that violates the Eight Amendment of the United States Constitution and article I, section 16 of the Tennessee Constitution. Franklin asserts that this $250 fee provides neither compensation nor restitution to the TBI for the cost of each test, which is approximately $100, and that this fee is "an example of an arbitrary deprivation of property—prohibited by substantive due process—through which the TBI has been able to balance their forensic division budget, and, recently, even to profit." He claims that if court costs are not adjusted to match the actual or reasonably estimated costs incurred, they become an excessive fine as prohibited by the Eighth Amendment of the United States Constitution and article I, section 16 of the Tennessee Constitution. The State responds that the $250 fee is not a fine and is reasonably related to the cost of conducting the blood test.

The United States Constitution and the Tennessee Constitution prohibit excessive fines. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); Tenn. Const. art. I, § 16 ("That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). Moreover, any fine over $50 must be assessed by a jury. Tenn. Const. art. VI, § 14 ("No fine shall be laid on any citizen of this State that shall exceed fifty dollars, unless it shall be assessed by a jury of his peers, who shall assess the fine at the time they find the fact, if they think the fine should be more than fifty dollars."). In France v. State, 65 Tenn. 478, 485 (1873), the Tennessee Supreme Court recognized that the provisions of article VI, section 14 "are manifestly an amplification" of the provisions in article I, section 16, which preclude the imposition of excessive fines.

We conclude that the $250 BADT fee is not an excessive fine. Historically, the prohibition on excessive fines was "aimed at the abuse of the unlimited power of courts in respect to fines, and was not intended as a limitation upon the power of legislation." France, 65 Tenn. at 485-86. In accordance with this principle, the Tennessee Supreme Court held that article VI, section 14 "refers to cases where the court has a discretion in fixing the amount of the fine" and has "no application . . . where the Legislature has peremptorily fixed the fine." Id. at 486. Because the $250 BADT fee, which was imposed by the General Assembly, is mandatory in every case in which an individual is convicted of the specified offenses, the trial court has no discretion when assessing it, and this fine cannot be considered excessive. See State v. Martin, 940 S.W.2d 567, 571 (Tenn. 1997) (recognizing that if a statute "effectively prevent[s] the trial judge from

exercising even the slightest measure of discretion" when assessing a fine, then the fine cannot be considered excessive). In light of the aforementioned authorities, we simply cannot conclude that the $250 BADT fee violates the Eighth Amendment of the United States Constitution or article I, section 16 of the Tennessee Constitution.

## CONCLUSION

Because the trial court erred in denying the motion to suppress given the unconstitutionality of the checkpoint, we reverse the judgments of the trial court, vacate Franklin's convictions, and dismiss the charges.[6] Otherwise, because Code sections 55-10-419 (2012) and 55-10-413 (2013-2017) violate principles of due process, we would reverse the convictions based on the trial court's failure to exclude the blood test evidence, and we would order a new trial.

_____

CAMILLE R. MCMULLEN, JUDGE

---

[6] Because the Tennessee Supreme Court granted the State's application for permission to appeal Rosemary L. Decosimo, 2018 WL 733218, a decision in that case may affect our holding in Franklin.